**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-2243

MELISSA B. KNIBBS, as Personal Representative of the Estate of Michael Scott Knibbs,

Plaintiff – Appellant,

v.

ANTHONY MOMPHARD, JR., Individually and in his official capacity as a Deputy Sheriff of the Macon County Sheriff's Department; ROBERT HOLLAND, in his Official capacity as the Sheriff of Macon County; WESTERN SURETY COMPANY, a South Dakota Corporation; THE OHIO CASUALTY INSURANCE COMPANY, a New Hampshire Corporation,

Defendants – Appellees.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Max O. Cogburn, Jr., District Judge. (1:19-cv-00130-MOC-WCM)

Argued: October 28, 2021                    Decided: March 30, 2022

Before NIEMEYER, AGEE, and RUSHING, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Rushing joined. Judge Niemeyer wrote a dissenting opinion.

**ARGUED:** Mark R. Melrose, MELROSE LAW, PLLC, Waynesville, North Carolina, for Appellant. Steven Andrew Bader, CRANFILL SUMNER LLP, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Adam R. Melrose, MELROSE LAW, PLLC, Waynesville,

North Carolina; Joshua D. Nielsen, NIELSEN LAW, PLLC, Waynesville, North Carolina, for Appellant. Patrick H. Flanagan, Stephanie H. Webster, CRANFILL SUMNER LLP, Charlotte, North Carolina, for Appellees.

AGEE, Circuit Judge:

In the course of responding to a dispute between neighbors just after midnight on April 30, 2018, Deputy Sheriff Anthony Momphard, Jr., of the Macon County, North Carolina, Sheriff's Office fatally shot Michael Knibbs while Knibbs was standing inside his home holding a loaded shotgun. Knibbs' widow, Melissa Knibbs, as personal representative of his Estate ("the Estate"), subsequently brought this action, asserting that Deputy Momphard used excessive force in violation of Knibbs' Fourth Amendment rights, along with various related state law claims. The district court held that Deputy Momphard was entitled to qualified immunity from the Estate's 42 U.S.C. § 1983 claim and that the Estate's state law claims against Deputy Momphard, Macon County Sheriff Robert Holland, and the insurance companies that issued the Sheriff's Office a liability insurance policy and a surety bond (collectively, "Defendants") necessarily failed. For the reasons set forth below, we affirm the district court's judgment in part, vacate it in part, and remand for further proceedings.

I.

Because this case was decided at the summary judgment stage, we review the facts in the light most favorable to the Estate as the non-moving party. *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021). That means that "we may not credit [Defendants'] evidence, weigh the evidence, or resolve factual disputes in . . . [D]efendants' favor." *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017).

A.

1.

Mr. Knibbs lived in a standalone home on Pheasant Drive in Macon County, North Carolina, with his wife, their minor son, their adult daughter, and her infant son. Pheasant Drive is a one-lane, private, dead-end, dirt road in a rural area without streetlights.

Shelton Freeman and his two roommates rented a house at the end of Pheasant Drive, which they could only access by driving past Knibbs' home. On the evening of Sunday, April 29, 2018, Freeman hosted a bonfire for several guests. One guest, Tanner, mistakenly pulled into Knibbs' driveway thinking it was Freeman's, and asked Knibbs for directions. A verbal altercation ensued in which Knibbs asked Tanner if he was going to his neighbor's house "to buy drugs" or "buy pills." J.A. 819. Knibbs then kicked Tanner's bumper "and told him to leave, get out of the driveway." *Id.* Knibbs had formed the belief that Freeman and his roommates posed a danger to his family in part because he suspected that they dealt drugs out of their home.

Sometime after sunset, one of Freeman's guests left the bonfire and began driving on Pheasant Drive towards Knibbs' home when she came upon several wooden boards laid in the middle of the road that appeared to have nails sticking up. She returned to Freeman's house to report what she saw. Based on his prior interactions with Knibbs,[1] Freeman called 911 at 11:41 p.m. to request police assistance.

---

[1] About one month before the incident in question, Knibbs approached Freeman regarding Freeman's dog's constant barking and allegedly told him to "shut your dog up or I'm going to shut your dog up." J.A. 811. Knibbs later came to Freeman's house to
(Continued)

Deputy Momphard was dispatched to the scene at 11:47 p.m. and arrived at 11:55 p.m. in his marked patrol vehicle. He wore his full standard issue uniform, which included his tactical vest, belt, handcuffs, firearm, and "everything [else] that a law enforcement officer has." J.A. 415. He parked his vehicle on Pheasant Drive—not in Knibbs' driveway—because of the wooden boards, which had "nails that could catch [his] tire and pop it." J.A. 231. Deputy Momphard did not activate his blue emergency light equipment.[2]

Seeing a light on in Knibbs' home, and thinking that the 911 call originated from that house, Deputy Momphard approached it. He recalled that "some form of light" was on in what he believed was the living room area, but there is no evidence that any of the house's exterior lights were on. J.A. 239. Deputy Momphard went to the home's northern-most entrance and announced "sheriff's office . . . two or three times." J.A. 238. No one responded, so he tried knocking on a door on the eastern side of the home and again twice announced, "sheriff's office." J.A. 239. He heard a dog bark inside, but no one answered the door.

Deputy Momphard then saw lights coming from Freeman's home, so he went there and made contact with Freeman, who explained the reason he called. While talking with

---

apologize. Freeman noted that Knibbs "was very obviously intoxicated." J.A. 812. After Knibbs apologized, he "persisted on trying to come in and look at the place," J.A. 813, but Freeman and his roommates declined to let him inside.

[2] The record does not reflect that Deputy Momphard was wearing a bodycam that night or that his patrol vehicle had any dashcam footage.

5

the officer, Freeman saw the lights inside Knibbs' home go off. He pointed this out to Deputy Momphard to underscore that Knibbs and his family were home.

Deputy Momphard then decided to return to Knibbs' home to investigate further. He admitted that initially he "did not know one way or the other" whether a crime had been committed. J.A. 233. But in his view, "[i]f Mr. Knibbs said, 'I threw those boards out there to pop tires,' that would be a criminal matter," J.A. 234, specifically attempted willful and wanton injury to personal property, a misdemeanor under North Carolina law, *see* N.C. Gen. Stat. § 14-160 (crime of willful damage to personal property); *id.* § 14–2.5 (crime of attempt).

2.

As Deputy Momphard approached the southernmost entrance to Knibbs' home, Freeman followed behind and began removing boards from Pheasant Drive approximately 20 to 30 feet away from Deputy Momphard. Both men observed that there were no lights on inside the house, and there were no lights illuminating the outside of the house. To that end, Mrs. Knibbs explained that prior to her and her husband retiring to their bedroom, as part of her nightly routine she turned out all of the lights in the home. She later indicated that there was a "little lamp" in their dining room that "gave off a little light," so "[y]ou could see a little bit." J.A. 526. The record is not clear, however, whether that light was on during the events in question. Deputy Momphard repeatedly testified at his deposition that there were no lights on inside the house.

Deputy Momphard came upon a small rectangular porch that led to what Freeman told him was the most trafficked entrance and exit to Knibbs' home, the southern entrance.

6

The porch was approximately 11' long and 13' wide. As Deputy Momphard stood at the bottom of the porch's four stairs, a doorway was directly in front of him. Both the door and the exterior storm door were closed. There were two large (51" x 31") windows immediately to the left of the doorway. To Deputy Momphard's right—and running all along the eastern portion of the porch—was one of the exterior walls of the home. On the other side of that wall were Mr. and Mrs. Knibbs' bedroom and a laundry room. According to Deputy Momphard, the following events occurred over the span of about one minute.

Deputy Momphard stood on the first step of the porch and announced, "sheriff's office." J.A. 266–67. He then immediately heard someone "walk[] around inside of the room next to [him]." J.A. 280. Mrs. Knibbs later confirmed that she and her husband were awake in their bedroom and heard Deputy Momphard's announcement. The blinds on their bedroom window, which overlooked the porch, were closed, so they could not see who was outside. Mr. Knibbs reacted by grabbing the all-black, pump-action shotgun he kept by his bed. He told his wife before leaving their bedroom, "[a]nybody can say they are a sheriff." J.A. 518. He then walked towards the porch door.

Meanwhile, outside, Deputy Momphard could hear Knibbs' footsteps as he approached the front door, but then he heard them "stop[] briefly," J.A. 290, so he paused on "the second step or third step," J.A. 281. At this point, Deputy Momphard heard "a rack of a shotgun," *id.*, which was also loud enough for Mrs. Knibbs to hear in her bedroom.

While Deputy Momphard recognized that Knibbs "ha[d] a right to come to the door with [a] firearm," he believed that the act of racking it meant that he was "going to use the shotgun on me." J.A. 308–09. In an interview with an investigator from the North Carolina

7

State Bureau of Investigation ("NCSBI") about thirty-six hours after the incident, Deputy Momphard stated that he recalled thinking that Knibbs was "going to shoot me through the door." J.A. 1342 at 45:17–22.

Instead of stepping back into the yard, Deputy Momphard proceeded onto the porch to seek cover in its northeast corner, where there was a 40" gap between the door and the porch's eastern wall. From there, he yelled out, "Drop it." J.A. 319. There was no audible response.

Deputy Momphard testified that he thought at the time that no matter what move he made next, "I was going to get shot either way. . . . I'm stuck on the porch, which is—it's a common understanding that the porch is a bad place for law enforcement. Law enforcement get shot on the porch." J.A. 330–31. Or, as Deputy Momphard more specifically phrased it during his NCSBI interview: "I felt like I was being hunted." J.A. 1342 at 48:55–49:02; *see also* J.A. 303 (Deputy Momphard testifying at his deposition that he believed he was being "hunted" once Knibbs racked his shotgun).

Standing in cover in the porch's northeast corner, Deputy Momphard observed three "fatal frontals," or places from which Knibbs could shoot him: the door, and the two windows to the left of the door. J.A. 331, 349. His plan at this point was to "get off the porch" and "seek cover." J.A. 349–50. He "hop[ed] not to" engage Knibbs, but "was willing if [he] needed to." J.A. 352–53.

Deputy Momphard saw two ways of getting off the porch. First, he could retreat via the stairs, but he thought this was dangerous because "[a]ll [Knibbs] had to do was open up the door [and] shoot me." J.A. 349. Second, he could cross the windows and move

8

towards the western portion of the porch. He believed this "was safer than going [towards the stairs] because [the stairs were] a straight shot, it doesn't take a marksman to be able to shoot somebody in the back running in a straight line." *Id.* He did not know, though, that there was no exit off the porch on its western side. There were no stairs; there was only a railing enclosing the porch.

Deputy Momphard decided to move across the porch past the windows to the western edge of the porch. He unholstered his firearm with his right hand and took out his flashlight with his left. Assuming a tactical stance, he began moving from right to left across the door to the windows. Either just before or right as he started to move, Deputy Momphard yelled "[d]rop it" a second time. Again, there was no response. At some point, Deputy Momphard turned the flashlight on. "Automatically" or "[d]irectly after" this second and final order, Mrs. Knibbs heard gunfire. J.A. 546. Deputy Momphard had crossed the threshold of the first window and saw Mr. Knibbs holding his shotgun. Deputy Momphard fired six shots, two of which fatally wounded Knibbs.

A subsequent autopsy revealed that one of the bullets entered the outside of Knibbs' upper right arm, traveling from right to left through his body with a slight downwards angle. The bullet went through his humerus and armpit and into his chest cavity, where it damaged his right lung and aortic artery, causing internal bleeding. The second entered just below the middle of his right clavicle (collarbone), with a similar right-to-left trajectory at a slightly downwards angle. This bullet injured both of Knibbs' lungs. The medical examiner also noted the presence of "stippling" on Knibbs' upper chest, neck, and his right forearm. "Stippling" refers to, *inter alia*, a pattern of very small red or brown dots that appear on

9

the skin "if a bullet is fired through an intermediate target, most commonly glass, which projects multiple tiny fragments of that target toward the area of the entrance wound." J.A. 1108. The medical examiner observed that the pattern of stippling on Knibbs' forearm was consistent with the pattern on his chest.

The Macon County Sheriff's Office did not administratively discipline Deputy Momphard for his use of force. The local prosecutor's office similarly declined to bring any criminal charges.

3.

Deputy Momphard explained at his deposition that he shot Knibbs because his flashlight revealed that Knibbs was holding his shotgun right-handed in a firing position with the barrel aimed "toward [his] face or [his] upper chest area." J.A. 321, 369–70. The Estate contests these claims.[3]

As an initial matter, the Estate challenges the need for Deputy Momphard to have confronted Knibbs at all. It has proffered the report of Jon Blum, a law enforcement training expert, in which he opined that Deputy Momphard's decision to seek cover on the porch after hearing Knibbs rack his shotgun was "reckless and contradicted his training." J.A. 1081. Blum also averred that, based on various statements Deputy Momphard made in his deposition, he went into an "emotional panic" that "led to a series of reckless decisions"

---

[3] There was no evidence Deputy Momphard could see anything inside the house before he illuminated his flashlight. He also claimed that when he did see Knibbs, the two were standing so close to each other that they could touch. Hal Sherman, the Estate's crime scene reconstruction expert, opined to the contrary that "it is more likely than not[] [that] the distance between Mr.'s [sic] Knibbs and Momphard exceeded 6 [feet]." J.A. 1055.

10

causing Knibbs' death. J.A. 1085. Indeed, during his NCSBI interview, Deputy Momphard explained that after he heard Knibbs rack his shotgun, he believed that Knibbs would kill everyone on scene: "He gave me no other option. He was going to murder me. He was gonna murder me, and then he was gonna go over [to where Freeman was standing] and kill [Freeman], over a freakin' right of way." J.A. 1342 at 49:51–50:12. Deputy Momphard also remarked how, in his view, Knibbs shut the light off inside his house before he approached "on purpose," and that Knibbs "knew exactly what he was fucking doing." J.A. 1342 at 51:45–52:30. These statements, Blum opined, demonstrate the "emotional panic" that led to Knibbs' death. J.A. 1085.

The parties also dispute the positioning of Knibbs' shotgun at the time Deputy Momphard shot him. There is no evidence that Knibbs made any furtive movements while holding his gun. The pertinent factual dispute is whether Knibbs in fact pointed the weapon at Deputy Momphard.

The Estate offered the report of forensic pathology expert Dr. Jonathan Arden, M.D., who proffered that it is more likely that Knibbs "was holding his shotgun left-handed with his right hand and arm across his chest in a safe stance with the barrel pointed upward, and the muzzle of the shotgun was not aimed at [Deputy] Momphard." J.A. 1109. Dr. Arden based his conclusion on the autopsy report and photographs, which showed evidence of stippling "along the radial aspect of the [right] forearm," that is, "the edge of the forearm aligned with the thumb." J.A. 1108. Dr. Arden asserted that this was significant for two reasons.

11

First, he explained that the presence of stippling on the right side of Knibbs' body, coupled with the entrance wounds there, made it more likely than not that Knibbs was holding his shotgun left-handed. Disputing Deputy Momphard's claim that Knibbs was holding his shotgun right-handed, Dr. Arden opined that the presence of entry wounds on the right side of Knibbs' body is "the exact opposite of what would have obtained had he been in a right-handed shooting stance." J.A. 1108. In addition to Dr. Arden's opinion, the Estate proffered the affidavits of two of Knibbs' hunting companions, both of whom averred that Knibbs always held and shot his shotgun left-handed.

Second, Dr. Arden opined that the pattern of stippling present on Knibbs' forearm demonstrated he was not aiming his shotgun at Deputy Momphard. Dr. Arden explained that if Knibbs had been aiming his shotgun at Deputy Momphard, his right hand would have been extended forward supporting the barrel of the shotgun, which would have exposed the back of his forearm (the "dorsal aspect") to the window. *Id.* If that were the case, Dr. Arden elaborated, one would expect there to be stippling on the *back* of Knibbs' forearm, not on the edge of the forearm aligned with the thumb. Indeed, the autopsy report reflected that, when placed across his chest, the pattern of stippling on the inside of Knibbs' right forearm (the "radial aspect") was consistent with that on his chest. Given the totality of this evidence, Dr. Arden concluded that it was more likely than not that Knibbs' right arm was across his chest while holding the shotgun pointed up at the ceiling. "In this positioning, his right upper arm could easily be slightly extended at the shoulder, away from the torso, as is necessary to fulfill the known wound path of the bullet that entered his right arm," *and* would "position the radial aspect of his forearm (but not the dorsal aspect)"

12

to be "exposed to the glass particles." J.A. 1109. In his opinion, this positioning of the shotgun accounts for the stippling on both Knibbs' forearm and chest.

Some of Deputy Momphard's own statements during his NCSBI interview could be taken as consistent with this theory. While he initially claimed that the shotgun was pointed at him, at another point during his interview Deputy Momphard stated that he did not know if the shotgun was "shouldered" or "under [Knibbs'] armpit"; he could only see that Knibbs "was standing canted to me in a position that somebody usually shoots when they're not used to combat-style shooting or the way that we shoot—like somebody that's hunting." J.A. 1342 at 48:37–49:00.

Deputy Momphard counters this evidence by pointing to crime-scene reconstruction expert Rod Englert, who opined that the forensic evidence is more consistent with Knibbs having pointed his shotgun at Deputy Momphard. He posited that the stippling that the medical examiner and Dr. Arden claimed to have observed on Knibbs' right arm was not stippling at all; it was blood spatter. In his opinion, that pattern of blood spatter matched the pattern on Knibbs' gun, which was "consistent with [Knibbs'] shotgun being in a raised horizontal position, below the upper chest wound, allowing the back-spatter to spray the right side of the shotgun" and the edge of his right forearm aligned with his thumb. J.A. 1256–57.

B.

The Estate brought suit in the Western District of North Carolina against Deputy Momphard, Sheriff Holland, the Western Surety Company ("Western Surety"), and the Ohio Casualty Insurance Company ("Ohio Casualty"). The Estate's Amended Complaint

13

raised six claims under federal and North Carolina law: (1) a § 1983 claim against Deputy Momphard in his individual capacity for violations of Knibbs' Fourth and Fourteenth Amendment rights; (2) a wrongful death claim under North Carolina law against Sheriff Holland in his official capacity; (3) a wrongful death claim under North Carolina law against Deputy Momphard in his individual and official capacities; (4) a claim for deprivation of rights under the North Carolina Constitution against Sheriff Holland in his official capacity; (5) a claim for deprivation of rights under the North Carolina Constitution against Deputy Momphard (individual or official capacity unspecified); and (6) a claim for punitive damages against Deputy Momphard in his individual capacity.[4]

Defendants moved for summary judgment on all claims, which the district court granted. It first found that Deputy Momphard was entitled to qualified immunity from the § 1983 claim because he had probable cause to believe that Knibbs posed an immediate threat of serious physical harm, and therefore acted reasonably in shooting him. The court initially recognized the parties' disputes regarding the distance between Knibbs and Deputy Momphard at the time of the shooting and whether Knibbs was actually aiming his shotgun at Deputy Momphard. But the court found these disputes immaterial:

> [E]ven assuming that Deputy Momphard misperceived that Knibbs' gun was pointed directly at him, and assuming that, in fact, the gun was pointed more toward the ceiling, Deputy Momphard did not have to detect that Knibbs was

---

[4] The Estate also brought a § 1983 claim against Sheriff Holland, and argued as a part of its § 1983 claim against Deputy Momphard that Deputy Momphard violated Knibbs' Second Amendment rights to bear arms in his own home. The district court granted summary judgment in favor of Deputy Momphard and Sheriff Holland on these claims, and the Estate does not challenge either ruling on appeal.

14

actually aiming and pulling the trigger before Deputy Momphard used deadly force to protect his own life.

J.A. 82. The court also found as "undisputed fact" that "Deputy Momphard was in uniform and readily recognizable as a law enforcement officer." J.A. 83. Based on these facts, the court concluded that "[a]ny objective officer . . . would have [had] sound reason to believe that Knibbs posed a threat of death or serious physical harm to him." J.A. 84.

Addressing the Estate's state law claims, the court first found that Deputy Momphard was entitled to public official immunity from the wrongful death claim because his use of force was reasonable. Next, to the extent that the Estate sued Deputy Momphard and Sheriff Holland in their official capacities, the court determined that neither the Macon County Sheriff's Office's insurance policy with Ohio Casualty nor its surety bond issued by Western Surety operated as a waiver of governmental immunity. Finally, the court rejected the Estate's claims brought directly under the North Carolina Constitution. While noting that such claims could proceed if the Estate had no other adequate remedy for a violation of state constitutional rights, the court held that the Estate's ability to bring a wrongful death claim on the merits—even if ultimately barred by public official immunity—was an adequate remedy.

The Estate timely noted an appeal. We have jurisdiction under 28 U.S.C. § 1291.


II.

We review de novo the district court's grant of summary judgment. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). That de novo review extends to the district

15

court's determinations regarding qualified immunity, *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018), "public official immunity[,] and other state law defenses," *Hensley*, 876 F.3d at 579.

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248).

In our de novo review, we must "take the facts in the light most favorable to the [Estate] to determine the applicable questions of law and ignore any contrary factual claims," even if "a jury could well believe the evidence forecast by the [Defendants]." *Hensley*, 876 F.3d at 579. That entails drawing "all reasonable inferences" from those facts in the Estate's favor, *Henry*, 652 F.3d at 531, and refraining from weighing the evidence or making credibility determinations, *Hensley*, 876 F.3d at 584 n.6.

Finally, to the extent this appeal requires us to decide questions of North Carolina law, we must utilize case law from that State's appellate courts to "predict" how the Supreme Court of North Carolina would rule on that issue. *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96 (4th Cir. 2011). We "respond conservatively when asked to discern governing principles of state law" and take care to avoid interpreting that law in a manner that "has not been approved" by the Supreme Court of North Carolina. *Id.*

16

III.

On appeal, the Estate argues that the district court failed to follow these well-established summary judgment standards. In particular, the Estate contends that the district court was required to accept its best evidence, from which a reasonable jury could find facts that would not entitle Deputy Momphard to qualified immunity for § 1983 purposes. For similar reasons, the Estate argues that public official immunity under North Carolina law is not available to Deputy Momphard. Finally, the Estate asserts that the district court erred in holding that Deputy Momphard and Sheriff Holland were entitled to governmental immunity from its state law official capacity claims, and in finding that its state constitutional claims were precluded. We address each contention in turn.

A.

We begin with the district court's conclusion that Deputy Momphard was entitled to qualified immunity from the Estate's § 1983 claim against him in his individual capacity.

"Section 1983 'creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States.'" *Hensley*, 876 F.3d at 580 (quoting *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013)). When, as here, a law enforcement officer is sued in his individual capacity, he is "entitled to invoke qualified immunity, which is . . . immunity from suit itself." *Cooper*, 735 F.3d at 158. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry*, 652 F.3d at 531. In determining whether an officer is entitled to qualified immunity,

17

we look to: (1) "whether a constitutional violation occurred"; and (2) "whether the right violated was clearly established," though we need not decide the issues in that precise order. *Id.*; *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

1.

We start with the first prong of the qualified immunity analysis, whether there was a violation of Knibbs' constitutional rights.

"The use of deadly force is a seizure subject to . . . the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The Fourth Amendment permits the use of deadly force when a police officer "has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others." *Cooper*, 735 F.3d at 159 (cleaned up). "To determine whether such probable cause existed here, we ask whether the Deput[y's] use of deadly force was 'objectively reasonable in light of the facts and circumstances confronting [him], viewed in the light most favorable to the [Estate], without regard to the Deput[y's] underlying intent or motivation.'" *Hensley*, 876 F.3d at 582 (cleaned up). Three factors, established in the seminal Supreme Court case *Graham v. Connor*, generally inform this analysis: (1) "the severity of the crime"; (2) "whether the suspect posed an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest." 490 U.S. 386, 396 (1989). We focus on "the totality of the circumstances" based on the "information available to the Deput[y] 'immediately prior to and at the very moment [he] fired the fatal shots.'" *Hensley*, 876 F.3d at 582 (citations omitted). Ultimately, "the question of whether the officer's actions were reasonable is a question of pure law." *Henry*, 652 F.3d at 531.

18

As the Estate views the record, Deputy Momphard approached Knibbs' home in the middle of the night to investigate what was, at most, an attempted crime against property. There were no lights on inside or outside the house, and Deputy Momphard never activated the blue emergency lights on his vehicle, so Knibbs could not see who was outside saying "sheriff's office." To protect himself, his wife, his daughter, his son, and his infant grandchild, Knibbs armed himself with a shotgun, loaded it, and stood at his front door with the barrel safely pointed towards the ceiling. The person outside then shouted to drop the gun, and seconds later shined a flashlight on him and shot him. Knibbs never made any verbal threats or movements with the shotgun. He was shot simply because he stood in his living room holding a shotgun. If a jury accepted those facts, the Estate then posits that under our decisions in *Cooper*, *Hensley*, and *Betton v. Belue*, 942 F.3d 184 (4th Cir. 2019), Deputy Momphard's use of force was unreasonable. The Estate contends that the district court's contrary analysis was tainted because it made factual findings and inferences in the light most favorable to Deputy Momphard instead of the Estate as the nonmovant.

Deputy Momphard responds that this case is straightforward: when he approached Knibbs' home the second time, he clearly announced his presence such that anyone inside the home would have known a law enforcement officer was outside. Notwithstanding, Knibbs decided to arm himself with a shotgun and racked it loud enough for Deputy Momphard to hear outside. Racking that shotgun, Deputy Momphard argues, would have caused any reasonable officer to fear for his life. He then made the split-second decision to take cover on the porch, and determined that the safest way off was to cross the windows

19

overlooking it. To try and defuse the situation, Deputy Momphard again ordered Knibbs to drop his firearm, but there was no indication that Knibbs complied. Instead, as Deputy Momphard crossed the porch and shined his flashlight inside the house, he saw Knibbs aiming the shotgun at him, compelling him to use deadly force. Echoing the district court, he contends that even if Knibbs was not aiming the gun at him, that is immaterial because his immunity "is dependent on whether [he] acted reasonably based on the information available to him; not whether [Knibbs], in fact, pointed a shotgun at him." Resp. Br. 14. He further relies upon our decisions in *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001), and *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991), which he argues demonstrate that "a reasonable officer in [his] situation would have a reasonable and objective belief that Knibbs posed a serious threat of physical harm to him." Resp. Br. 22.

We find that the parties' factual disputes are quintessentially "genuine" and "material." Assuming that a jury would credit the Estate's expert evidence over Deputy Momphard's competing testimony and expert evidence, as we must at the summary judgment stage, an application of the *Graham* factors leads to the conclusion that Deputy Momphard's use of force was objectively unreasonable.

a.

The first *Graham* factor counsels us to consider the severity of the crime the officer was investigating. At first blush, this would seem to favor the Estate. Under its evidence, Deputy Momphard reapproached Knibbs' home to investigate what was either a civil dispute between neighbors or at most an attempted misdemeanor property crime. But our analysis must focus "on the circumstances as they existed at the moment the force was

20

used." *Anderson*, 247 F.3d at 132. Here, Knibbs' racking of his shotgun is what initially caused Deputy Momphard to fear for his life. That action was unrelated to the original reason that he approached the home that night (to investigate the boards with nails in the road). So, even when reading the facts in the light most favorable to the Estate, this factor is not particularly germane to our analysis. *See id.* at 131–32 (assuming that a suspected violation of a concealed weapons ban was a minor infraction but nonetheless deeming it irrelevant because at the moment the officer used deadly force, the suspect made furtive movements causing the officer to reasonably believe that the suspect "posed a deadly threat to himself and others").

b.

Taking the other factors in reverse, the third focuses on whether the suspect was actively resisting or evading arrest at the time the officer used deadly force. When analyzed in the light most favorable to the Estate as the nonmoving party, this factor favors the Estate, as Deputy Momphard conceded that he was not trying to arrest Knibbs at the time. He was only trying to investigate a dispute between neighbors that may have involved an attempted misdemeanor property crime.

c.

As the first and third *Graham* factors offer only limited probative guidance, Deputy Momphard's claim to qualified immunity rests on the strength of the second—whether Knibbs posed an immediate threat to his life. As explained below, at the summary judgment stage, genuine disputed issues of material fact preclude finding that Knibbs posed an objectively immediate threat to Deputy Momphard's life as a matter of law.

21

i.

"[S]pecial difficulties can arise during summary judgment" in use of deadly force cases like this one because Deputy Momphard "has killed the only other potential witness" that can directly refute his account of what happened on the porch. *Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022). Without Mr. Knibbs' account, it can "be easy to overvalue the narrative testimony of [Deputy Momphard] and to undervalue potentially contradictory physical evidence." *Id.* We are therefore mindful of Rule 56's demand "to avoid simply accepting [Deputy Momphard's] self-serving statements and . . . consider *all* contradictory evidence." *Id.* (emphasis added). A holistic review of the record reflects at least two genuinely disputed and material facts: (1) whether Knibbs aimed his gun at Deputy Momphard; and (2) whether Deputy Momphard was "readily recognizable as a law enforcement officer" on Knibbs' porch, J.A. 83.

First, the Estate has produced competent evidence that would allow a jury to find that Knibbs did not aim his shotgun at Deputy Momphard. Dr. Arden opined that the stippling present on Knibbs' body was consistent with Knibbs having held the gun up towards the ceiling. Moreover, a jury could find Deputy Momphard's credibility impeached by his admission during his NCSBI interview that he could not tell if Knibbs had the gun shouldered or under his armpit. Thus, whether Knibbs aimed his gun at Deputy Momphard is a genuinely disputed fact that goes directly to whether he posed an objectively immediate threat. *See Strothers*, 895 F.3d at 326.

The district court's finding that Deputy Momphard was "readily recognizable" as law enforcement is also genuinely disputed. J.A. 83. In ordinary circumstances of daily life,

22

Deputy Momphard likely was readily recognizable as such. But this case concerns the darkened conditions on Knibbs' porch. The record, when read in the light most favorable to the Estate as the nonmoving party, shows Deputy Momphard conceded there were no exterior or interior lights on at Knibbs' home during the encounter. *E.g.*, J.A. 353 (conceding that he was "on a darkened porch with no exterior lights"). And Deputy Momphard acknowledged that he never activated his police cruiser's blue emergency light equipment. J.A. 304. While he contends that there was a full moon that night providing enough light to see outside, J.A. 374, Blum contrarily opined that "[e]ven with a full moon on [the night in question], Pheasant Drive was still very dark," J.A. 1068. The pictures of the scene outside Knibbs' house from the night of the incident that Blum included in his report are so dark that it is difficult to discern precisely what they depict. *See* J.A. 1068–69. In other words, the record does not conclusively establish that Knibbs could have visually identified Deputy Momphard as a law enforcement officer on his porch that night.

Our application of these basic summary judgment standards lays the groundwork for our disagreement with our dissenting colleague. Without citation to Rule 56 or the record, the dissent accepts essentially all of Deputy Momphard's self-serving assertions and reads the record in the light most favorable to him, the party *moving* for summary judgment. *See, e.g.*, Diss. Op. 57 ("The moon was full, though, which, *according to Deputy Momphard*, made it easy for anyone to see him or the marked vehicle." (emphasis added)); Diss. Op. 61 ("[D]uring the entire time Deputy Momphard was investigating the incident . . . Knibbs would have been able to see Momphard and recognize he was in uniform."). We routinely reverse district courts that have granted summary judgment based on this

23

"misapplication of the summary judgment standard[s]." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569–70 (4th Cir. 2015). With respect to our dissenting colleague, we once again decline to endorse the district court's misapplication of those standards in this case.

ii.

These genuinely disputed facts are also material because a jury's acceptance of the Estate's proffered evidence would "affect the outcome of the suit under the governing law." *Libertarian Party of Va.*, 718 F.3d at 313 (citation omitted). Specifically, those factual findings would permit the conclusion that Deputy Momphard unreasonably believed that Knibbs posed an imminent danger of deadly harm.

Accepting the Estate's version of events, as we must at this stage, Knibbs was shot inside his own home while holding a loaded shotgun that was not aimed at Deputy Momphard. There is no record evidence that Knibbs, while holding his shotgun, made any furtive movement towards Deputy Momphard that would indicate his intent to cause physical harm. Further, as noted above, it is debatable whether Deputy Momphard was readily recognizable as a law enforcement officer in the middle of the night on Knibbs' unlit porch. These contested material facts, when viewed in their totality, bear a strong resemblance to our previous rulings in *Cooper*, *Hensley*, and *Betton*—all of which held that a police officer used unconstitutionally excessive force in shooting a man holding a firearm on his own property who was neither pointing the weapon at the officer nor giving some other indicator of an immediate intent to harm.

In *Cooper*, officers approached Cooper's mobile home on foot to investigate a reported "altercation" at approximately 11:00 p.m. 735 F.3d at 155. When they did, they could hear people arguing inside, so they tapped on the mobile home's window with their flashlight, but did not identify themselves as deputy sheriffs. *Id.* Cooper looked outside to investigate, but could see nothing, so he retrieved his twenty-gauge shotgun and stepped onto "his darkened porch." *Id.* "Reacting to the sight of Cooper and his shotgun," and without giving any warning or identifying themselves, the officers shot Cooper. *Id.* at 156. Accepting this evidence at the summary judgment stage, we held that the officers unreasonably feared for their safety because "the mere possession of a firearm by a suspect is not enough to permit the use of deadly force." *Id.* at 159.

> [A]n officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon. Instead, deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is *threatened* with the weapon.

*Id.* Without evidence that Cooper made any "sudden moves" or threats, or that he ignored any commands, we explained that a reasonable juror could find that the officers had no "probable cause to feel threatened by Cooper's actions." *Id.*

Similarly, in *Hensley*, the plaintiff's evidence at the summary judgment stage showed that Hensley held a handgun in his hand as he walked off his porch towards law enforcement officers. 876 F.3d at 578. The handgun was pointed down towards the ground during the entire incident, and Hensley "never raised the gun toward the Deputies or made any overt threats toward them." *Id.* Nor did the deputies order him to stop, drop the gun, or "issue[] any type of warning" before shooting him. *Id.* Under these facts as proffered by

25

Hensley—despite contrary factual assertions from the deputies—we reversed the district court's grant of summary judgment to the deputies on qualified immunity grounds because a jury could reasonably conclude that Hensley posed no reasonable danger to the deputies, and that they "shot Hensley simply because he had a possession of a firearm." *Id.* at 583.[5]

Finally, in *Betton*, officers entered Betton's home pursuant to a search warrant without announcing their presence. 942 F.3d at 188. Betton drew a handgun from his waistband and held it by his hip pointing down. *Id.* at 188–89. Once he entered the living room where the police officers were located—with his gun still pointing down—officers shot him without giving any instructions or warning. *Id.* at 189. We held that a reasonable juror could conclude that these actions constituted excessive force, noting that "Betton could not have known that members of law enforcement caused the noise that he heard on his property, because the officers had failed to announce their presence at any time before firing their weapons." *Id.* at 193. And Betton made no "'sudden moves' to reach for potential weapons in disregard of officers' verbal commands." *Id.* at 192.

These cases substantially inform our analysis here. Under the Estate's evidence, (which, again, we are required to credit at this stage), Knibbs "never pointed the [shot]gun at *anyone*." *Hensley*, 876 F.3d at 582. So, "[i]f a jury credited [this] evidence, it could conclude that [Deputy Momphard] shot [Knibbs] only because he was holding a gun,

---

[5] The record in *Hensley* did not establish whether Hensley in fact recognized the Deputies as police officers or whether they were readily recognizable as such. Hensley's evidence did establish, however, that the deputies never identified themselves as law enforcement officers. *Id.* at 578.

although he never raised the gun to threaten [him]." *Id.* The use of deadly force is not justified as a matter of law in these circumstances. "Instead, deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is *threatened* with the weapon." *Cooper*, 735 F.3d at 159. Accepting the Estate's evidence, a reasonable juror could conclude that Knibbs made no such threats to Deputy Momphard, rendering the use of deadly force unconstitutionally excessive.

Deputy Momphard urges a contrary result based on what he views are three legally significant facts distinguishing this case from *Cooper*, *Hensley*, and *Betton*: (1) he announced his presence upon reapproaching Knibbs' home; (2) Knibbs racked his shotgun after that announcement; and (3) Knibbs ignored two commands to drop the weapon. These factors collectively are not the talismans he proffers.

First, it is uncontested that Deputy Momphard announced his presence at least once when he approached Knibbs' home the second time. To be sure, our decisions have noted that an officer "*might*" be objectively justified under particular circumstances in fearing for his life upon observing an individual holding a firearm after making his presence as an officer known. *Cooper*, 735 F.3d at 159 ("If the Officers had [identified themselves], they *might* have been safe in the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat." (emphasis added)); *see also Betton*, 942 F.3d at 193. But an officer's announcement of his presence is not dispositive in assessing whether an officer reasonably feared for his or her life before using deadly force. Rather, it must be considered under the totality of the circumstances.

27

Under the circumstances proffered by the Estate's evidence, there was no lighting either inside or outside of Knibbs' home. And it is undisputed that Deputy Momphard's blue emergency lights were not operating. Against this backdrop, a reasonable officer would have recognized that it was unknown whether Knibbs could discern who was outside on his porch before answering the door.[6] Such an officer would have also recognized that Knibbs, in turn, was within his lawful rights to arm himself to "investigat[e] a nocturnal disturbance on his own property." *Cooper*, 735 F.3d at 160 (quoting *Pena*, 316 F. App'x at 312). That decision would have been, and in fact was, "perfectly reasonable," and it "should have been apparent to [Deputy Momphard] at the time of the shooting" that Knibbs could do so. *Id.* (quoting *Pena*, 316 F. App'x at 312). After all, "the need for defense of self, family, and property is most acute" in one's home. *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008). Deputy Momphard readily acknowledged this premise at his deposition, admitting that Knibbs "ha[d] a right to come to the door with his firearm" and that "[i]t wouldn't have been an issue" if Knibbs opened the door while holding his shotgun—"I would have had a casual conversation with him just as I had a million different times with a lot of other people." J.A. 308–09.

What escalated the situation, in Deputy Momphard's view, was Knibbs' act of racking his shotgun after Deputy Momphard announced his presence. But, as we stated in

---

[6] This is not to say that a claim of qualified immunity will depend on the subjective beliefs of the individual with whom a police officer interacts. "[T]he crucial fact is not what [Knibbs] subjectively believed," but rather what Deputy Momphard "reasonably perceived in light of the circumstances known to [him] at the time." *Pena v. Porter*, 316 F. App'x 303, 312 n.8 (4th Cir. 2009).

*Cooper*, "deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is *threatened* with the weapon." 735 F.3d at 159. Racking a shotgun inside one's home, without more, is no more threatening than coming to the door with any other loaded firearm. Indeed, any reasonable officer would presume that an individual carrying a firearm has already loaded it. *See McLaughlin v. United States*, 476 U.S. 16, 17 (1986) ("[T]he law reasonably may presume that [a gun] is always dangerous even though it may not be armed at a particular time or place."). Our case law focuses not on the fact that an individual is armed in his own home, but on his movements while holding the firearm that objectively indicate that he imminently plans to use it to harm the officers or a third party. *See Hensley*, 876 F.3d at 585–86 (collecting cases).

Here, under the particular facts proffered by the Estate, Deputy Momphard could not see Knibbs rack his shotgun, *see* J.A. 1054 (Sherman opining that Deputy Momphard could not have seen Knibbs "while standing at the top of the [porch] stairs" when he heard the shotgun racked), and he had not heard Knibbs make any verbal threats at any point.[7] Viewing the evidence in the light most favorable to the Estate, a jury could find that Knibbs only racked his shotgun in order to load it while investigating who was on his porch in the middle of the night. Accepting that factual premise, Knibbs' act of racking a shotgun within

---

[7] The dissent echoes Deputy Momphard's claim that he heard Knibbs mutter an expletive right after Deputy Momphard announced his presence. Mrs. Knibbs contrarily testified at her deposition that she only heard her husband say to her that "[a]nybody can say they are a sheriff." J.A. 518; *see* J.A. 516–18. Taking the evidence in the light most favorable to the Estate, we must again disregard Deputy Momphard's claim. We express no opinion as to how that conflicting testimony would be resolved by a jury or impact the ultimate decision in this case.

29

his own home without any other gesture would not have caused a reasonable officer to fear for his life.

Underscoring this point, Sheriff Holland unequivocally testified at his deposition that Deputy Momphard would not have been justified in using deadly force based on Knibbs' decision to rack his shotgun alone. Specifically, he testified:

> SHERIFF HOLLAND: [Deputy Momphard] said he heard the racking of a shotgun.
>
> ESTATE'S COUNSEL: All right. At that point in your opinion would Mr. Momphard have been justified shooting through the door at Mr. Knibbs?
>
> SHERIFF HOLLAND: No. . . . It's not illegal to rack a shotgun.

J.A. 739–40.

Lastly, Deputy Momphard asserts that his fear for his life became reasonable under the totality of the circumstances after Knibbs ignored his two commands to drop the shotgun. That argument rests primarily on our decisions in *Slattery* and *Anderson*, two cases involving an officer's reasonable—but ultimately incorrect—belief that an individual possessed a firearm and was about to use it. Most importantly, the suspects in those cases made furtive movements toward a perceived firearm while disobeying the officer's command not to do so. Such actions, we held, would rightfully cause a reasonable officer to fear that the suspect intended to cause imminent deadly harm. *See Slattery*, 939 F.2d at 215–16 (holding an officer reasonably feared for his life after he twice ordered the suspect to put his hands up, but the suspect ignored those commands, instead reaching down to an area out of the officer's sight and grabbing an object that turned out to be a beer bottle);

30

*Anderson*, 247 F.3d at 128, 131 (holding that an officer reasonably feared for his life during an investigation of a man thought to be armed after the officer ordered the man to get down on his knees and put his hands up, but the man began reaching in his back left pocket for what turned out to be a Walkman radio).

In *Hensley*, we explained the import of our holdings in *Slattery* and *Anderson*:

In both cases, once the officer issued a verbal command, the character of the situation transformed. If an officer directs a suspect to stop, to show his hands or the like, the suspect's *continued movement* will likely raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions. Even when those intentions turn out to be harmless in fact, as in *Anderson* and *Slattery*, the officer can reasonably expect the worst at the split-second when he acts.

876 F.3d at 585 (emphasis added). In other words, the focus in those cases was on the suspects' furtive movements *after* readily recognizable law enforcement officers ordered a suspect to drop a weapon outside the confines of his own home. *See also Elliott v. Leavitt*, 99 F.3d 640, 641–43 (4th Cir. 1996) (holding officers reasonably feared for their lives when a handcuffed suspect pointed a gun at them and ignored commands to drop it); *McLenagan v. Karnes*, 27 F.3d 1002, 1005–08 (4th Cir. 1994) (holding an officer reasonably feared for his life in shooting an unarmed man running towards him in an office building, even though he had no time to issue a command to drop the weapon, because another officer was yelling, "The man has got a gun!," so the officer reasonably perceived in a "split-second judgment" that the man was armed).

These principles distinguish *Slattery* and *Anderson* from this case. As we have explained, a reasonable officer would have anticipated both that Knibbs would be armed and may not readily ascertain the fact that a police officer was outside his home. Commands

31

to drop a shotgun under these circumstances stand in stark contrast to the commands issued to the individuals in *Slattery* and *Anderson*, both of whom were ordered to cease engaging in behavior that a reasonable officer would have perceived as life-threatening. Instead, here, a reasonable officer would have perceived Knibbs' decision to remain armed as a means of self-defense until he was able to ascertain whether the individual outside his home was in fact a law enforcement officer. *See also Pauly v. White*, 874 F.3d 1197, 1203–05, 1219 (10th Cir. 2017) (police officers approached the home of two brothers after 11:00 p.m. on a dark and rainy night about two hours after the brothers were the victims of a road-rage incident, but the officers "provided inadequate police identification by yelling out 'State Police' once"; the court held that a reasonable officer would have concluded "that [the plaintiff] could believe that persons coming up to his house at 11:00 p.m. were connected to the road rage incident," and so would have interpreted the brothers' decision to arm themselves as one "to protect their home from ostensible home invaders"), *cert denied.*, 138 S. Ct. 2650 (2018).[8]

That observation compels us to respectfully disagree with the district court, and our dissenting colleague, that it was immaterial whether Knibbs was aiming his firearm at Deputy Momphard the moment the fatal shots were fired. The positioning of the shotgun is material because it is the *only* fact under the present record that should have caused a

---

[8] We do not rely on this out-of-circuit authority for the proposition that Deputy Momphard violated a clearly established right, *see infra* Section III.A.2, but instead only to demonstrate what a reasonable officer would have logically inferred from the circumstances that Deputy Momphard encountered.

reasonable officer in Deputy Momphard's position to fear for his life. Deputy Momphard conceded that Knibbs never made any furtive movements in the few brief moments he saw Knibbs holding his shotgun. And if a jury credits Dr. Arden's expert opinion at trial, it could also find, based on the stippling present on Knibbs' chest and right forearm, that Knibbs never aimed the gun at Deputy Momphard. That finding would make this case fundamentally indistinguishable from our prior precedents concerning the use of deadly force upon an individual possessing a firearm in a non-threatening manner inside his own home. As in *Hensley*, "[i]f a jury credited [the Estate's] version of the facts, it could reasonably conclude that because [Knibbs] never raised the gun to [Deputy Momphard], and because [Knibbs] never otherwise threatened [him], [Deputy Momphard] shot [Knibbs] simply because he had possession of a firearm" within the confines of his own home. *Hensley*, 876 F.3d at 583; *accord Cooper*, 735 F.3d at 159–60. "[S]uch conduct violates the Fourth Amendment." *Hensley*, 876 F.3d at 583.[9]

We do not mean to say that an officer must wait until a gun is pointed at him before he is entitled to use deadly force when other factors (like furtive movement) indicate an imminent threat to life. To the contrary, "[t]his Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *Anderson*, 247 F.3d at 131 (collecting cases). But there is a line that our case

---

[9] Alternatively, a jury could believe Deputy Momphard's account of the events and find as a fact that Knibbs was pointing the gun at him after ignoring his commands. This very well could "affect the outcome of the suit under the governing law," *Libertarian Party of Va.*, 718 F.3d at 313 (citation omitted), because "[n]o citizen can fairly expect to draw a gun on police without risking tragic consequences," *Elliott*, 99 F.3d at 644.

law has drawn between lawfully possessing a firearm for self-defense in one's own home, and possessing a firearm (or other object) in a manner that objectively threatens an officer's life or the life of another person. Under the totality of the circumstances as proffered by the Estate, a reasonable officer would have recognized that there was no imminent threat to his life simply because Knibbs refused to drop a loaded shotgun that he was pointing safely towards the ceiling while standing inside his own home peering onto his unlit porch to investigate a nocturnal disturbance. *Compare with Sigman v. Town of Chapel Hill*, 161 F.3d 782, 787–88 (4th Cir. 1998) (holding that officers acted reasonably in fearing for their lives before shooting an individual who the officers knew had made threats to his own life and to the officers' lives after the individual exited his home while appearing to hold a knife, walked towards the officers, and disobeyed an officer's commands to stop).

Our core disagreement with the district court and our dissenting colleague on this issue is not caused by our alleged failure to analyze the totality of the circumstances. *See* Diss. Op. 63–64. We instead analyze a *different totality of disputed facts* altogether. The material underlying factual issues—whether Deputy Momphard was readily recognizable as a law enforcement officer and whether Knibbs aimed his gun at Deputy Momphard—are disputed at the summary judgment stage. Because Deputy Momphard is the moving party, we are constrained to assume that the jury will not credit his evidence and will instead accept the Estate's proffered evidence on disputed fact questions. But the dissent, like the district court, contravenes Rule 56 by accepting Deputy Momphard's self-serving statements and reading the evidence in the light most favorable to *him*. *See Tolan v. Cotton*, 572 U.S. 650, 660 (2014) (per curiam) (summarily vacating the grant of summary judgment

34

to the movant-police officer because the court below "weigh[ed] the evidence and reach[ed] factual inferences contrary to [the nonmovant-plaintiff's] competent evidence," thereby "neglect[ing] to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party").

Viewing this case in the light most favorable to the *Estate*, there is sufficient evidence for a reasonable jury to find that Knibbs never pointed his weapon at Deputy Momphard or made any furtive movements, thereby rendering unjustified the deadly force used against Knibbs. The district court therefore erred in finding that there were no genuine issues of disputed material fact, and ultimately erred in finding that Deputy Momphard's use of force was reasonable as a matter of law at this stage in the proceedings.

2.

Deputy Momphard would still be entitled to qualified immunity if he could show that the constitutional right he violated was not "'clearly established' at the time of [his] alleged misconduct." *Pearson*, 555 U.S. at 232; *see Stanton*, 25 F.4th at 233 (noting that in this Circuit, a defendant-officer bears the burden to prove that a right was not clearly established). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). "It is not enough," the Supreme Court has cautioned, "that a rule be suggested by then-existing precedent." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (per curiam). Instead, "the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

35

(internal quotation marks omitted) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)). "[W]e have long held that it is case law from this Circuit and the Supreme Court that provide notice of whether a right is clearly established." *Hill v. Crum*, 727 F.3d 312, 322 (4th Cir. 2013) (citation omitted).

Before deciding if a right was clearly established, we must first define the right at issue with specificity. *See id.* "[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12 (alterations and internal quotation marks omitted). Thus, it is not enough to say in this case that Deputy Momphard violated Knibbs' clearly established right to be free from the use of excessive force, because that right is defined at too "high [a] level of generality." *Rivas-Villegas*, 142 S. Ct. at 8 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).

Utilizing these principles, the question is whether it was clearly established in April 2018 that an officer may not use deadly force against a homeowner who possesses a firearm inside his own home while investigating a nocturnal disturbance but does not aim the weapon at the officer or otherwise threaten him with imminent deadly harm. This is so even after the homeowner hears the officer announce himself—but cannot visually verify that to be true—and ignores commands to drop the weapon.

We recognize that neither the Supreme Court nor this Circuit has considered a qualified immunity case with a fact pattern precisely identical to the instant one, but that does not preclude a finding that the right was clearly established. *White v. Pauly*, 137 S. Ct.

36

548, 551 (2017) (per curiam) ("While this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the . . . constitutional question beyond debate." (cleaned up)); *accord Hill*, 727 F.3d at 322. As explained below, our case law demonstrates that the contours of Knibbs' constitutional right were clearly established in April 2018.

*Cooper* and *Hensley* are clear regarding an individual's right to arm himself in his own home without fear of being shot by police, so long as he does not threaten the officer with the weapon.[10] *Cooper* first established, at a higher level of generality, that "an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon." 735 F.3d at 159. Indeed, we reasoned that this right was evident from the very cases the dissent now relies on to assert Deputy Momphard violated no clearly established right. *Compare id.* at 159–60 (explaining that "[t]he precedent discussed herein," which included only *Anderson*, *McLenagan*, *Slattery*, *Elliott*, and *Pena* (an unpublished case), "amply demonstrates that the contours of the constitutional right at issue . . . were clearly established"), *with* Diss. Op. 67 (arguing that *Slattery*, *Anderson*, *Elliott*, and *Sigman* compel the conclusion that Knibbs' right was not clearly established).

*Hensley* applied that right more directly to the particular situation presented in this appeal, observing that "[t]he lawful possession of a firearm by a suspect at his home, *without more*, is an insufficient reason to justify the use of deadly force." 876 F.3d at 583

---

[10] *Betton* also establishes that right, but because that case was decided after the events at issue here took place, we do not factor it into our analysis.

(emphasis added). Moreover, *Hensley*'s ultimate holding encapsulates the violation of constitutional rights asserted here:

> If a jury credited the plaintiff's version of the facts, it could reasonably conclude that because Hensley never raised the gun to the officers, and because he never *otherwise threatened* them, the Deputies shot Hensley simply because he had possession of a firearm. As we held in *Cooper*, such conduct violates the Fourth Amendment.

*Id.* (emphasis added).

That said, *Hensley* did not expound upon what qualifies as "without more" or "otherwise threatened" to justify the use of deadly force against a homeowner possessing a weapon in his home. Deputy Momphard argues that something "more" existed here: "[A] reasonable officer would not have believed that a suspect has a clearly established right to be free from seizure by deadly force, after the suspect racked his shotgun and ignored commands to drop the weapon." Resp. Br. 22–23. Seizing onto that premise, our dissenting colleague asserts that Deputy Momphard's announcement of his presence at the outset of the encounter makes this case so different as to justify granting him qualified immunity. *See* Diss. Op. 66–67. But if the jury accepted the Estate's proffered evidence, none of these facts would take this case outside the contours of the constitutional right that *Cooper* and *Hensley* clearly established.

Deputy Momphard's announcement of his presence is not dispositive when considered in the context of all of the Estate's evidence. While that fact was absent in both *Cooper* and *Hensley*, a core principle of our holding in *Cooper* is present here. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (explaining that our "clearly established" analysis "must consider not only 'specifically adjudicated rights,' but also

'those manifestly included within more general applications of the core constitutional principles invoked.'" (citation omitted)). Namely, given the lack of lighting on Knibbs' porch and Deputy Momphard's failure to activate the blue emergency light equipment on his patrol vehicle, a reasonable officer would not have believed Knibbs unquestionably knew a law enforcement officer was on his porch. *See Cooper*, 735 F.3d at 159–60.

Further, if a jury accepts the Estate's evidence, Knibbs' decision to rack his shotgun also does not impact the totality of the circumstances. Given *Cooper*'s holding that a homeowner is entitled to possess a firearm during his investigation of a nocturnal disturbance on his premises, a reasonable officer would have logically inferred that a homeowner is entitled to *load* his firearm before conducting that investigation for his own protection without fear that an officer will use deadly force against him. *See Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019) ("[A]lthough we must avoid ambushing government officials with liability for good-faith mistakes made at the unsettled peripheries of the law, we need not—and should not—assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense."); *see also Rivas-Villegas*, 142 S. Ct. at 9 ("Precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful." (citation and internal quotation marks omitted)).

Nor are the two commands that Knibbs ignored legally significant at this point under the Estate's proffered facts. *Cooper*, *Hensley*, *Slattery*, *Anderson*, *Sigman*, *McLenagan*, and *Elliott* together clearly establish that the failure to obey commands by a

39

person in possession of, or suspected to be in possession of, a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person. If a jury finds that Knibbs was not aiming or otherwise directing his gun at Deputy Momphard—the only fact that would have given him probable cause to fear for his life considering the totality of the Estate's evidence—this case would fall squarely within the contours of those clearly established precedents.

Underscoring this conclusion is Sheriff Holland's own testimony:

| | |
|---|---|
| ESTATE'S COUNSEL: | And is it your contention or belief, Sheriff, that if a sheriff's deputy announces "sheriff's office" from outside a residence, that the occupants must disarm? |
| SHERIFF HOLLAND: | No, I didn't say that. |
| ESTATE'S COUNSEL: | Okay. So they don't have to disarm. If the sheriff's deputy is outside the residence and somebody's lawfully possessing a shotgun and the sheriff's deputy says, Drop it, from outside the house, must the occupant of the house in your opinion drop their firearm? |
| SHERIFF HOLLAND: | If an officer gives a lawful command to an individual who's armed, who's holding a gun, there's nothing wrong with that officer asking them to put that gun down, to drop that gun. . . .<br><br>If that individual refuses to drop that gun, *as long as that individual doesn't point it at my officer or an officer, then that officer's not going to shoot that individual*. . . . |
| ESTATE'S COUNSEL: | If a lawful command is given to a person to drop a firearm and they don't comply, you're saying |

40

> that's still not a basis for deadly force unless it's used in an aggressive manner or pointed?

SHERIFF HOLLAND:     Correct.

J.A. 755–57 (emphasis added).

Therefore, if a jury accepts the Estate's version of the events, Deputy Momphard could be found to have violated Knibbs' clearly established Fourth Amendment right to possess a firearm in his own home in a non-threatening manner while investigating a nocturnal disturbance on his premises.

Our dissenting colleague asserts that our analysis runs contrary to the Supreme Court's recent summary reversals in *City of Tahlequah* and *Rivas-Villegas*. Not so. In those cases, the lower courts relied on precedents that were "dramatically different," *City of Tahlequah*, 142 S. Ct. at 12, and "materially distinguishable" in "several respects," *Rivas-Villegas*, 142 S. Ct. at 8, to find a violation of a clearly established constitutional right. As the dissent would have it, Deputy Momphard would be held liable for his conduct only if one of our prior cases addressed the same facts presented here. But as noted, even the Supreme Court does not require as much. *See also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). In fact, even "cases involving 'fundamentally similar'" or "materially similar" facts are not prerequisites for concluding that a constitutional right is "clearly established." *Id.*

As we have explained, assuming that the jury accepts the Estate's evidence, *Cooper* and *Hensley* are materially indistinguishable from what happened here. And for the few

41

factual differences that do exist, it would not have taken more than Deputy Momphard "drawing logical inferences, reasoning by analogy, or exercising common sense" from those two cases to realize that his use of deadly force against a homeowner possessing a firearm in a non-threatening manner in his own home while investigating a nocturnal disturbance was unconstitutional. *Williams*, 917 F.3d at 770. Under these circumstances, the contours of Knibbs' constitutional right were "beyond debate" in April 2018. Accordingly, we vacate the district court's award of summary judgment to Deputy Momphard on the Estate's § 1983 claim against him in his individual capacity.

B.

The Estate also claims error in the district court's summary judgment award to Deputy Momphard on its § 1983 claim that his use of force violated Knibbs' Fourteenth Amendment due process rights. This claim, however, has been foreclosed by the Supreme Court since 1989. *See Graham*, 490 U.S. at 395 ("Today we . . . hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."). We therefore affirm the award of summary judgment to Deputy Momphard on this claim.

C.

We turn now to the Estate's state law wrongful death claim against Deputy Momphard in his individual capacity.

42

North Carolina's wrongful death statute provides a remedy to the personal representative of a decedent's estate when the decedent would have otherwise been entitled to damages caused by another person's "wrongful act, neglect[,] or default." N.C. Gen. Stat. § 28A–18–2(a). This statutory right supersedes all common law claims that could have been asserted. *Christenbury v. Hedrick*, 234 S.E.2d 3, 5 (N.C. Ct. App. 1977).

One such wrongful act that can subject law enforcement officers to civil liability under the North Carolina wrongful death statute is the use of unreasonably excessive force. *See Wilcox v. City of Asheville*, 730 S.E.2d 226, 231–32 (N.C. Ct. App. 2012); *see also Hensley*, 876 F.3d at 587–88. Instead of utilizing general negligence principles, the North Carolina General Assembly has "codif[ied] and clairf[ied] those situations in which a police officer may use deadly force without fear of incurring criminal or civil liability" in a separate statute. *State v. Irick*, 231 S.E.2d 833, 846 (N.C. 1977). Relevant here, that statute provides that an officer is justified in using deadly force if it is "reasonably necessary . . . [t]o defend himself or a third person from what he reasonably believes to be the use of Imminent deadly physical force." N.C. Gen. Stat. § 15A-401(d)(1)–(2).

But even if a police officer acting under the color of state law violates North Carolina's use of deadly force statute, that officer still may be entitled to public official immunity from a wrongful death suit brought against him in his individual capacity. *See Mills v. Duke Univ.*, 759 S.E.2d 341, 344 (N.C. Ct. App. 2014). Distinct from qualified immunity under § 1983, which is a purely objective analysis, North Carolina's public official immunity doctrine "involves a determination of the subjective state of mind of the governmental actor." *Andrews v. Crump*, 547 S.E.2d 117, 123 (N.C. Ct. App. 2001). Under

43

this framework, "a public official is immune from suit unless the challenged action was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Wilcox*, 730 S.E.2d at 230. The Estate only alleges that Deputy Momphard acted with malice, J.A. 42, so our analysis is accordingly limited.

"[E]lementally, a malicious act is an act (1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." *Wilcox*, 730 S.E.2d at 230. The intent to injure can either be "actual" or "constructive." *Id.* at 231. North Carolina law "presumes 'that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law,'" so evidence of malice "must be sufficient by virtue of its reasonableness, not by mere supposition." *Doe v. City of Charlotte*, 848 S.E.2d 1, 12 (N.C. Ct. App. 2020) (quoting *Strickland v. Hedrick*, 669 S.E.2d 61, 68 (N.C. Ct. App. 2008)).

Deputy Momphard argues that he could not have acted maliciously, and thus is entitled to public official immunity, because there is no evidence that he acted with "some type of personal animosity" towards Knibbs. Resp. Br. 27. In rejoinder, the Estate contends that Blum's opinions regarding the recklessness of Deputy Momphard's actions would allow a reasonable jury to conclude that he acted with "reckless or heedless indifference" to Knibbs' rights. Opening Br. 40. Bolstering this concept, the Estate points to Deputy Momphard's statements in his NCSBI interview and his deposition as evidence that he "incorrectly[] believed that Knibbs was hunting him," and thus maliciously "took the most aggressive approach at every opportunity." Reply Br. 10. As with the § 1983 claim

discussed earlier, genuine issues of material fact preclude us from affirming the district court's grant of summary judgment to Deputy Momphard.

We begin with the requirement that the officer not take an action that a reasonable man would know is contrary to his duty. In that regard, we have previously held that the use of deadly force in violation of North Carolina's deadly force statute, N.C. Gen. Stat. § 15A–401(d), is an act done contrary to an officer's known duties, *see Hensley*, 876 F.3d at 587–88. The same facts that a jury could find that would permit the conclusion that Deputy Momphard's use of force was unreasonable under the Fourth Amendment would also permit a finding that he acted contrary to his duties as a law enforcement officer because he violated the use of deadly force statute. *See Hensley*, 876 F.3d at 587–88.

Next, Deputy Momphard's actions must not have been taken "wantonly," that is, they must not have been committed "needlessly, manifesting a reckless indifference to the rights of others." *Grad v. Kaasa*, 321 S.E.2d 888, 890–91 (N.C. 1984). Blum has opined on behalf of the Estate that Deputy Momphard's decision to seek cover on the porch after hearing Knibbs rack his shotgun was "reckless and contradicted his training." J.A. 1081. He also averred that, based on various statements Deputy Momphard made in his deposition, Deputy Momphard went into an "emotional panic" that "led to a series of reckless decisions" causing Knibbs' death. J.A. 1085. Deputy Momphard's rebuttal law enforcement training expert, Chad Thompson, opined the exact opposite—that Deputy Momphard's actions were entirely reasonable. J.A. 1269–70. This presents a classic jury question. Assuming that a jury would credit the Estate's evidence, as we must at the summary judgment stage, it could find that Deputy Momphard acted wantonly.

45

The closer question is whether Deputy Momphard acted with the requisite intent to injure Knibbs. The Estate has not specifically argued that there is evidence of actual intent, so we will presume that it relies on a constructive intent theory.

The North Carolina Court of Appeals has emphasized that "mere reckless indifference is insufficient" to show a constructive intent to injure. *Wilcox*, 730 S.E.2d at 232. Instead, a plaintiff must also show that the defendant's actions were "so reckless or so manifestly indifferent to the consequences, where the safety of life or limb is involved, as to justify a finding of [willfulness] and wantonness equivalent in spirit to an actual intent." *Id.* at 231 (alteration in original) (quoting *Foster v. Hyman*, 148 S.E. 36, 38 (N.C. 1929)). This question is a factual one, *id.* at 232, which North Carolina courts typically reserve for a jury, *see, e.g.*, *Leiber v. Arboretum Joint Venture, LLC*, 702 S.E.2d 805, 813 (N.C. Ct. App. 2010).

Persuasive in this analysis is the North Carolina Court of Appeals' decision in *Hart v. Brienza*, 784 S.E.2d 211 (N.C. Ct. App. 2016). In that case, officers responded to a domestic dispute at a home just before 3:00 a.m., believing that there was an active shooter on the scene. *Id.* at 213–14. They witnessed the suspect, Hart, trying to climb into the house through a window. *Id.* Officers ordered him to get out of the window and onto the ground. *Id.* at 214. When he did so, one of the officers fired three shots, hitting Hart once. *Id.* The officers claimed that they saw him reach for a shotgun that was near him resting against the house. *Id.* However, Hart claimed that he never reached for the gun and instead put his hands up. *Id.* This "conflicting evidence," the court explained, gave rise to "genuine issues of fact concerning whether" the officer acted with malice. *Id.* at 216. Accepting Hart's

46

evidence that he was unarmed with his hands raised when he was shot, the court held that this could be sufficient to "pierce the cloak of official immunity." *Id.* (citation omitted).

Similarly, here, conflicting evidence regarding (1) whether Knibbs was aiming his firearm at Deputy Momphard at the time of the shooting, and (2) whether Deputy Momphard "jeopardized his own safety to confront Mr. Knibbs at all costs for what was a 'civil matter' between neighbors" for which he had "no intent to arrest" Knibbs, J.A. 1086 (Blum's expert opinion), presents triable issues of fact regarding Deputy Momphard's constructive intent to injure Knibbs. The Estate's version of events, if accepted by a jury, would support a finding that Deputy Momphard acted with the requisite malice in shooting Knibbs. *See Hart*, 784 S.E.2d at 216. We therefore vacate the district court's grant of summary judgment to Deputy Momphard on the Estate's individual capacity claims against him under the North Carolina wrongful death statute.[11]

D.

The Estate also asserted state law claims against Sheriff Holland and Deputy Momphard in their official capacities. Official capacity actions against sheriffs and deputy sheriffs are, in effect, suits against the county sheriff's office. *See Boyd v. Robeson County*, 621 S.E.2d 1, 5 (N.C. Ct. App. 2005). Such official capacity actions that arise out of the

---

[11] The Estate also seeks to overturn the district court's award of summary judgment to Deputy Momphard on its claim for punitive damages against him in his individual capacity. Deputy Momphard offers no rebuttal on this point, which we construe as a waiver. *See Alvarez v. Lynch*, 828 F.3d 288, 295 (4th Cir. 2016) ("[S]uch an outright failure to join in the adversarial process . . . ordinarily result[s] in waiver."). Therefore, the judgment on this claim must be vacated, and the claim is remanded for further proceedings.

47

torts allegedly committed by the sheriff or his employees while performing a "governmental function" are barred by the county's governmental immunity, absent a waiver of that immunity. *Greene v. Barrick*, 680 S.E.2d 727, 730–31 (N.C. Ct. App. 2009).[12]

Relevant here, a county sheriff's office may waive its governmental immunity by purchasing liability insurance, *Wright v. Gaston County*, 698 S.E.2d 83, 87 (N.C. Ct. App. 2010), or a surety bond (as it is statutorily mandated to do), *see* N.C. Gen. Stat. § 162–8; *White v. Cochran*, 748 S.E.2d 334, 339–40 (N.C. Ct. App. 2013). The district court granted summary judgment to Defendants on all official capacity claims, finding that neither the Macon County Sheriff's Office's liability insurance policy nor its surety bond waived its governmental immunity. We agree with the former conclusion, but disagree with the latter.

1.

It is well established under North Carolina law that a county agency may waive its governmental immunity from suits for damages caused by an employee's negligent conduct "by purchasing liability insurance, but only to the extent of the insurance coverage." *Estate of Earley ex rel. Earley v. Haywood Cnty. Dep't of Soc. Servs.*, 694 S.E.2d 405, 408 (N.C. Ct. App. 2010) (quoting *Dickens v. Thorne*, 429 S.E.2d 176, 179 (N.C. Ct. App.

---

[12] It is uncontested that Deputy Momphard was performing a "governmental function" on the night in question. We also note that while the parties' briefs at times use the phrases "sovereign immunity" and "governmental immunity" interchangeably, the two concepts are distinct under North Carolina law. Whereas sovereign immunity applies to the State and its agencies, governmental immunity applies to a county and its agencies, such as the Macon County Sheriff's Office. *See Meyer v. Walls*, 489 S.E.2d 880, 884 (N.C. 1997).

48

1993)); *see* N.C. Gen. Stat. § 153A–435(a). That said, a county does not waive governmental immunity "[i]f the liability policy, by its plain terms, does not provide coverage for the alleged acts." *Ballard v. Shelley*, 811 S.E.2d 603, 606 (N.C. Ct. App. 2018). To determine the extent of a policy exclusion, North Carolina courts employ the "traditional rules of contract construction," strictly construing the exclusion in favor of coverage and enforcing its unambiguous plain language. *Patrick v. Wake Cnty. Dep't of Hum. Res.*, 655 S.E.2d 920, 924 (N.C. Ct. App. 2008) (citations omitted).

The Estate argues that the district court erred in finding that the Macon County Sheriff's Office retained governmental immunity, despite the fact that it obtained a liability insurance policy with Ohio Casualty. While the Sheriff's Office had a liability insurance policy at the time of this incident, the policy contained a "North Carolina Immunity Non-Waiver Endorsement." J.A. 1320. Defendants urge us to adopt the reasoning of the district court, which found that the portion of this policy endorsement specifying that the policy "shall not be deemed a waiver of any statutory immunities" preserved the County's governmental immunity. J.A. 89 (citation omitted).

Even if we assume, without deciding, that the district court erred in this regard,[13] we would nonetheless affirm based on other provisions of the "North Carolina Immunity

---

[13] The district court may have erred as governmental immunity is a *common law*, not statutory, immunity. *E.g.*, *Orange County v. Heath*, 192 S.E.2d 308, 309 (N.C. 1972). The provision relied on by the district court (and by Defendants on appeal) does not refer to common law immunities in general, or to governmental immunity in particular; it only refers to statutory immunities. The plain language of this particular provision, then, could counsel against finding a preservation of governmental immunity. But, as indicated above, it is unnecessary to resolve that issue.

49

Non-Waiver Provision." *See United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 375 (4th Cir. 2015) ("[O]f course, we may affirm a district court's ruling on any ground apparent in the record."). Specifically, that provision also stated that the policy "[d]oes not apply to any . . . 'suit' . . . for any amount for which any insured would not be liable under any applicable governmental or sovereign immunity but for the existence of this policy." J.A. 1320; *see* J.A. 1293 (Section III of the policy, defining "insured" to include the County, "[a]ll of [its] full or part-time 'employees,' and [its] lawfully elected, appointed or employed officials"). This provision thus plainly establishes that the policy does not cover lawsuits from which the County would have governmental immunity absent the policy. Accordingly, the County's liability insurance policy does not operate as a waiver of governmental immunity from the Estate's official capacity wrongful death claims. The district court correctly granted summary judgment on this claim.

2.

The Estate also seeks to recover damages from Deputy Momphard and Sheriff Holland in their official capacities pursuant to Sheriff Holland's surety bond. North Carolina requires sheriffs to purchase such a bond "for the . . . faithful execution of his office." N.C. Gen. Stat. § 162–8. That bond, by statute, renders the sheriff and his sureties liable "for all acts done by [the sheriff] by virtue or under color of his office" to "[e]very person injured by the neglect, misconduct, or misbehavior." N.C. Gen. Stat. § 58–76–5. Liability under the bond also extends to the acts of a sheriff's deputy, for "[t]he acts of the deputy are acts of the sheriff." *Styers v. Forsyth County*, 194 S.E. 305, 308 (N.C. 1937).

50

Nonetheless, the district court found that the Estate's surety bond claim failed as a matter of law "[b]ecause [the Estate] has failed to produce evidence sufficient to support a tort claim against Defendants." J.A. 90. That conclusion appears to solely rest on the court's finding that Deputy Momphard was entitled to public official immunity from the Estate's state law wrongful death claim. *See* J.A. 88–89.

Echoing this point during oral argument, Deputy Momphard, Sheriff Holland, and Western Surety argued that the Estate's surety bond claim necessarily fails because Deputy Momphard is entitled to public official immunity from those individual capacity claims. As discussed above, however, Deputy Momphard is not entitled to public official immunity as a matter of law at this stage in the proceedings. The summary judgment award on the surety bond claim must therefore be vacated for this reason alone.

Even if Deputy Momphard were entitled to public official immunity from the individual capacity state law tort claim against him, Defendants' argument is foreclosed by our decision in *Lee v. Town of Seaboard*, 863 F.3d 323 (4th Cir. 2017). In that case, we considered whether a district court erroneously awarded summary judgment to the defendant-city as to a plaintiff's official capacity tort claims under North Carolina law arising out of the alleged use of excessive force by one of the city's police officers. On appeal, the city argued that those official capacity claims were barred by the officer's entitlement to public official immunity from the plaintiff's individual capacity claims against him. We rejected this argument, explaining that "public official immunity does not immunize a municipality from liability for torts committed by a municipal employee acting in his official capacity." *Id.* at 330 n.6. Thus, where a county or municipality has waived

51

its governmental immunity—such as pursuant to a sheriff's surety bond—"and is being sued for its own conduct and the conduct of [one of its officers] in his *official* capacity," the individual police officer's public official immunity "is of no consequence." *Id.*

Here, it is undisputed that the County has waived its governmental immunity from the Estate's wrongful death claims to the extent of the County's surety bond, which is $25,000. Deputy Momphard's possible entitlement to public official immunity from the individual capacity claim against him is thus "of no consequence" to the Estate's *official* capacity claims against the Sheriff's Office based on his actions. *Id.* Accordingly, we vacate the district court's judgment on the Estate's surety bond claim.[14]

E.

Lastly, we address the Estate's claims against Sheriff Holland and Deputy Momphard that arise directly under the North Carolina Constitution based on the alleged deprivation of Knibbs' state constitutional rights.

North Carolina courts have interpreted the State's constitution to provide an individual "whose state constitutional rights have been abridged" with "a direct claim against the State under [the North Carolina] Constitution," but only "in the absence of an adequate state remedy." *Corum v. Univ. of N.C.*, 413 S.E.2d 276, 289 (N.C. 1992). In order for another remedy to be "adequate," "a plaintiff must have at least the opportunity to enter

---

[14] That the County lacks governmental immunity from the Estate's surety bond claim for damages up to $25,000 does not mean that the Estate will prevail on the merits. The County only sought summary judgment on governmental immunity grounds, so we have no occasion to consider whether it is entitled to summary judgment on other bases.

the courthouse doors and present his claim." *Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ.*, 678 S.E.2d 351, 355 (N.C. 2009). Relevant here, *Craig* held that the State's invocation of sovereign immunity rendered a common law negligence claim an inadequate remedy because it "precludes" the plaintiff from litigating the claim on the merits. *Id.* Relying on *Craig*, the Estate contends that its state law individual capacity claims cannot be an "adequate" remedy because Deputy Momphard's public official immunity precludes it from litigating those claims on the merits.

The Estate's argument is precluded by the North Carolina Court of Appeals' ruling in *Wilcox*. In that case, the court rejected the assertion that the doctrine of public official immunity rendered a state tort law claim an inadequate remedy. That result aligned with *Craig*, the court reasoned, because *Craig* made clear that "adequacy is found not in success, but in chance." 730 S.E.2d at 237. The court observed that, unlike sovereign or governmental immunity, public official immunity does not "absolutely, entirely, or automatically preclude[]" a plaintiff from presenting a claim on the merits. *Id.* It is instead more akin to "a usual affirmative defense" that can be overcome through evidence of malicious conduct. *Id.* Accordingly, the court concluded, "it cannot be said that [a defendant's] assertion of the public official immunity defense entirely precludes suit and renders [a plaintiff's] common law claims inadequate." The Supreme Court of North Carolina denied discretionary review of this ruling. 738 S.E.2d 401 (N.C. 2013) (Mem.).

Anticipating our citation to *Wilcox*, the Estate argues that its holding is irreconcilable with *Craig*. The North Carolina Court of Appeals rejected that same argument in *DeBaun v. Kuszaj*, 767 S.E.2d 353, 356–57 (N.C. Ct. App. 2014), and the

53

Supreme Court of North Carolina again denied discretionary review, 768 S.E.2d 853 (N.C. 2015) (Mem.).

Because we are a federal court applying state law, we are bound to follow *Wilcox* and *DeBaun*. *See Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002 (4th Cir. 1998). We can only disregard those decisions if we are "convinced by other persuasive data" indicating that the Supreme Court of North Carolina would reject those holdings. *Id.* (quoting *West v. AT&T*, 311 U.S. 223, 237 (1940)). No such data exist, and the parties direct us to none. Quite the opposite: that court *denied* discretionary review in both cases, indicating to us its acceptance of these rulings. *See, e.g.*, *United States v. Harris*, 941 F.3d 1048, 1055 n.2 (11th Cir. 2019) (treating as binding state intermediate appellate court decisions because the state supreme court denied discretionary review); *Nelson v. City of Irvine*, 143 F.3d 1196, 1206–07 (9th Cir. 1998) (same).

We therefore follow *Wilcox* and *DeBaun* and hold that the Estate's direct state constitutional claims are precluded by the presence of another adequate state remedy.[15]

IV.

For the foregoing reasons, we vacate the district court's grant of summary judgment on the following claims and remand the case for further proceedings: (1) the § 1983 claim against Deputy Momphard in his individual capacity; (2) the wrongful death claim for both

---

[15] The district court also found that the Estate's surety bond claim was an adequate alternative remedy. We need not consider the Estate's challenge to this ruling, given our holding that the Estate's state law individual capacity claims are an adequate remedy.

54

compensatory and punitive damages under North Carolina law against Deputy Momphard in his individual capacity; and (3) the claims under the Macon County Sheriff's Office's surety bond against Deputy Momphard and Sheriff Holland in their official capacities, and against Western Surety, for up to $25,000 in damages. However, we affirm the district court's conclusions that: (1) the Estate's Fourteenth Amendment claim fails as a matter of law; (2) Macon County's liability insurance policy preserves the Sheriff's Office's governmental immunity from suit; and (3) the Estate's claims brought directly under the North Carolina Constitution are precluded.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

NIEMEYER, Circuit Judge, dissenting:

This case presents the unfortunately-too-frequent situation in which a law enforcement officer is faced with the risk of serious physical harm and, in face of that risk, makes a split-second decision to shoot the person who created the risk. *See, e.g., Sigman v. Town of Chapel Hill*, 161 F.3d 782, 784–85 (4th Cir. 1998); *Elliott v. Leavitt*, 99 F.3d 640, 641–42 (4th Cir. 1996). If that officer *reasonably had "probable cause to believe"* that he was confronted with a risk to him of "*serious physical harm*," he cannot be held liable for addressing the risk with deadly force. *See Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). This principle applies even if the facts, when parsed in hindsight, suggest that the officer made the wrong judgment. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sigman*, 161 F.3d at 786–87. Moreover, if there is no "*clearly established*" law that would inform a reasonable officer in the circumstances that using deadly force was, "beyond debate," a violation of law, then the conduct is protected by qualified immunity. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8–9 (2021) (per curiam); *see also Pearson*, 555 U.S. at 231; *Sigman*, 161 F.3d at 786.

The facts of this case are tragic, and unfortunately nothing can be done now to undo the loss. But in the aftermath, we must nonetheless carefully determine whether, under the governing legal principles, a law enforcement officer who sought to do his job in good faith should be held responsible for the damages resulting from the loss.

# I

The record in this case contains, to be sure, a few disputed facts, but none of them is material to the legal determination of whether the law enforcement officer violated the deceased person's legal rights or whether the officer is entitled to qualified immunity. The record shows the following.

On April 29, 2018, at 11:44 p.m., the Macon County Sheriff's Office in Macon County, North Carolina, received a 911 call from Shelton Freeman, complaining that the only access road to his house, which was on a dead-end street, was being blocked by Scott Knibbs, a neighbor who had laid several boards in the street with nails protruding upward. The boards were laid in front of Knibbs's house, which had to be passed to get to Freeman's house. Deputy Sheriff Anthony Momphard, Jr., was dispatched to investigate the complaint. He did so while in full uniform and in a marked Sheriff's Office vehicle.

When Deputy Momphard arrived at the scene, he viewed the boards in the street and stopped his vehicle short of them, so as not to puncture a tire. He left his headlights on but did not turn on his vehicle's flashing blue lights. The moon was full, though, which, according to Deputy Momphard, made it easy for anyone to see him or the marked vehicle. He then approached Knibbs's house, believing that the 911 call had come from his house. As Deputy Momphard approached and walked around the house, he announced multiple times that he was from the Sheriff's Office and, after passing one door, he knocked on a second door. Notwithstanding his efforts, no one answered, although he did hear a dog bark after knocking at the door.

Hearing voices from the next house on the street — beyond the boards — Deputy Momphard walked to that house and encountered Freeman, who turned out to be the complainant and who was hosting a small party of about eight persons. The attendees were sitting around a campfire and drinking beer.

Freeman told Deputy Momphard of the problem with the boards, which were discovered when one of his guests was unable to leave to go home without risking the puncture of her tires. In their discussion, which took place in view of Knibbs's house, Freeman told Deputy Momphard that Knibbs was an "aggressive" person, and he related how Knibbs had earlier had an altercation with a party guest who had accidentally pulled into Knibbs's driveway when looking for Freeman's house. As the guest pulled out of the driveway, Knibbs kicked the side of the guest's vehicle. Freeman told the Deputy that he thought Knibbs was home because he saw the lights flip on and off when the Deputy was knocking on Knibbs's door. While Freeman and the officer were talking, they both saw the lights in Knibbs's house again flip on and off, and the two agreed that somebody was indeed home at Knibbs's house. Deputy Momphard told Freeman that he was right in not confronting Knibbs directly but rather in calling for help. The Deputy said that he would talk to Knibbs, explaining that this was probably a civil matter, but he would try "to do what he [could] do" "to straighten things out." Freeman followed Deputy Momphard who instructed Freeman to stand behind the Sheriff's Office vehicle.

The two walked together to Knibbs's house, and once there, Freeman remained in the street where the boards were while Deputy Momphard walked around the house announcing loudly, "Sherriff's Office." After he knocked on the front porch door in an

58

effort to get a response from Knibbs, he heard Knibbs say, "fuck," and then heard his footsteps as Knibbs approached the door. When Deputy Momphard again announced, "Sheriff's Office," he heard Knibbs "rack" his gun to load it. Deputy Momphard testified that at that moment he feared for his life, and he instructed Knibbs forcefully to "drop" the gun two or three times — or, as Freeman heard two or three times, "Put it down." When Knibbs failed to comply and also said nothing, Deputy Momphard recognized from his training that this was a "pre-assault indicator." Believing that he was about to be "shot over a stupid right of way issue," Deputy Momphard looked for a way to move away from the door. Seeking a safer position, he moved across a window and, according to him, then saw Knibbs staring at him with a gun pointed at him. Deputy Momphard immediately fired several shots at Knibbs, hitting him twice. The time from the faceoff through the door to when Deputy Momphard fired his service pistol was only seconds. Deputy Momphard called for backup and Knibbs was declared dead.

Among these facts, the only dispute is whether Knibbs's gun was actually pointed at Deputy Momphard when the Deputy crossed the window. That dispute is based on an expert's opinion that, based on the nature of Knibbs's two bullet wounds, Knibbs was not aiming his gun at Deputy Momphard at the moment he was shot.

The facts that are undisputed, however, support the conclusion that Deputy Momphard had probable cause to believe that he was at risk of serious physical injury and therefore was entitled to use deadly force to protect himself. *Garner*, 471 U.S. at 11; *Waterman*, 393 F.3d at 477; *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991).

## II

The majority denies Deputy Momphard qualified immunity because it concludes that material facts are in dispute. It relies most heavily on the purported fact that Knibbs did not "readily recogniz[e]" that it was a law enforcement officer at the door, as opposed to some unknown person from whom Knibbs was entitled to protect himself. With that assumption, the majority concludes that Knibbs was only exercising his constitutional right to protect himself and his family by coming to the door with a loaded gun. While the majority necessarily acknowledges that "our decisions have noted that an officer 'might' be objectively justified under particular circumstances in fearing for his life upon observing an individual holding a firearm *after making his presence as an officer known*," citing *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013) (emphasis added), and *Betton v. Belue*, 942 F.3d 184, 193 (4th Cir. 2019), it concludes that there was no objective way for Knibbs to know "who was outside on his porch before answering the door." *Supra* at 28. This conclusion, however, defies the common-sense reality presented by the facts of record.

First, no one testified that Deputy Momphard did not loudly announce his presence as a sheriff on numerous occasions during two visits to Knibbs's house — once before talking to Freeman and once after. Freeman testified that he heard Deputy Momphard's announcements numerous times. And Knibbs's wife — who was inside the house — said that both she and Knibbs heard it. Finally, Deputy Momphard testified that he called out "Sheriff's Office" as Knibbs was walking to the door. In addition, it is undisputed that Deputy Momphard pulled his vehicle up to the boards, which, according to Freeman, lay in front of Knibbs's house about 20 to 30 feet away — or according to pictures in the record,

60

perhaps even closer than that — and left his headlights on. The vehicle was a typically marked law enforcement vehicle with a light rack on the roof, and there was a full moon. Moreover, during the entire time that Deputy Momphard was investigating the incident, beginning with his visit to Knibbs's house and then with his visit to Freeman and then back to Knibbs's house, Knibbs would have been able to see Momphard and recognize he was in uniform. It is telling that during the time that Deputy Momphard was conducting the investigation, the lights in Knibbs's house flipped on and off at least twice, also suggesting an awareness by its occupants of Deputy Momphard's presence. Also, when Deputy Momphard announced himself during his second visit to Knibbs's house, that announcement, according to Knibbs's wife, prompted Knibbs to grab his shotgun and walk to the front door. And Knibbs's wife testified that Knibbs had told her that he laid the boards in the street to keep people "from going back and forth all night" and that she knew why the Sheriff's Office was there — "because someone had called about the boards." Finally, when Deputy Momphard identified himself to Knibbs at close range through the door and ordered him to drop the gun, Knibbs did not respond to express doubt about who was at the door or to ask any questions. In light of these numerous facts, Knibbs surely knew that he was facing a law enforcement officer, and none are disputed. Yet, acknowledging only some of them, the majority concluded that "whether Deputy Momphard was *readily recognizable as a law enforcement officer* on Knibbs' porch" is a genuinely disputed material fact. *Supra* at 22 (emphasis added) (cleaned up). Remarkably, the majority finds that "the record does not conclusively establish that Knibbs could have visually identified Deputy Momphard as a law enforcement officer on his porch that night,"

61

*supra* at 23, leading to its conclusion that he was defending his home against an unknown person.

Even more importantly, however, the question is not what Knibbs knew, but what Deputy Momphard reasonably believed. The majority correctly acknowledges that the "crucial fact is not what Knibbs subjectively believed, but rather what Deputy Momphard reasonably perceived in light of the circumstances known to him at the time." *Supra* at 28 n.6 (cleaned up). But then it dedicates its focus on *what Knibbs readily recognized* and concludes that the record supports a finding that Knibbs was merely defending himself and his family from an *unknown person*. This error lies at the heart of the majority's wrongful denial of Deputy Momphard's qualified immunity.

Based on the *undisputed facts* in this record, Deputy Momphard undoubtedly had probable cause to believe — as would any reasonable officer — that Knibbs knew that he was facing a law enforcement officer; that Knibbs had just loaded his gun in the presence of the law enforcement officer; that Knibbs had refused to drop his gun in response to the officer's commands; and that Knibbs refused to speak or ask questions to resolve any doubt. Yet, the majority's analysis fails to account for what a reasonable officer would have perceived in light of these undisputed facts about what Deputy Momphard saw and experienced, focusing instead on Knibbs's subjective beliefs. Moreover, to do so, the majority discounts Deputy Momphard's testimony as "self-serving" and therefore turns to accept the "Estate's proffered evidence" about what Deputy Momphard saw and experienced, even while recognizing that the Estate's only witness to the events was Knibbs. *Supra* at 34–35, *id*. at 22. It then concludes that Knibbs's Estate legitimately

showed that "[Knibbs] was shot simply because he stood in his living room holding a shotgun." *Supra* at 19.

The only other fact that the majority identifies as disputed is whether Knibbs was actually pointing the gun at Deputy Momphard at the time Deputy Momphard passed the window and fired his shots. But that fact hardly dispels the risk that Deputy Momphard reasonably perceived, which must be the focus of the inquiry. In this case, Deputy Momphard reasonably believed that he was at risk of serious bodily injury *when he stood on the opposite side of the door from Knibbs*. Knibbs, after all, did not communicate with Deputy Momphard and had a shotgun, which he had just racked and refused to drop at the Deputy's command. When Deputy Momphard attempted to move to a safer position, he had to pass the window, where he saw Knibbs holding the gun, prompting Deputy Momphard's immediate response. The issue is not whether Deputy Momphard was actually at risk of harm *at that moment*, but whether, in the totality of the circumstances, he reasonably believed that he was at risk of serious bodily injury. *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 582 (4th Cir. 2017); *Anderson v. Russell*, 247 F.3d 125, 131–32 (4th Cir. 2001); *McLenagan v. Karnes*, 27 F.3d 1002, 1006–08 (4th Cir. 1994); *Slattery*, 939 F.2d at 216–17. Thus, whether the gun was actually pointing at Deputy Momphard at that point is irrelevant, because we have "consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *Anderson*, 247 F.3d at 131.

Apart from the core error in failing to view the circumstances from Deputy Momphard's point of view, the majority opinion adds a layer of additional error in

63

addressing, *in isolation*, each factor that Deputy Momphard relied on and then concluding that the isolated factor was insufficient to justify Deputy Momphard's belief. This is boldly contrary to the majority's correct observation that it is required to focus on "the totality of the circumstances." *Supra* at 18; *see also Hensley*, 876 F.3d at 582. Nonetheless, the majority considered each factor in isolation. It addressed first the factor identified by Deputy Momphard that Knibbs racked his gun as he approached the door. Addressing this, the majority concludes simply that merely "[r]acking a shotgun inside one's home" is not "threatening." *Supra* at 29. After it rejects that factor, it next addresses Deputy Momphard's reliance on the fact that Knibbs failed to drop the gun, concluding that Knibbs's failure to obey "two commands to drop the shotgun" is not threatening because Deputy Momphard did not see any furtive movements by Knibbs, and anyway Deputy Momphard was not "readily recognizable" as a law enforcement officer. *Supra* at 30–31. But the majority fails to acknowledge that Knibbs was behind a closed door refusing to obey a sheriff's deputy, and therefore, while Deputy Momphard would not be able to see whether Knibbs engaged in furtive movements, he did know, in the totality of the circumstances, he was in clear risk of being shot. The majority simply did not assess, as required, "the totality of the circumstances," including Knibbs's failure to communicate and other contextual circumstances. *Hensley*, 876 F.3d at 582.

Taking the circumstances in their totality and from the perspective of a reasonable officer, we have an officer investigating, in good faith, a neighborhood dispute when he came upon one neighbor, described as aggressive and perhaps unreasonable in laying out boards with nails, who (1) knows the officer is there; (2) comes to the door with a shotgun;

64

(3) racks it as he approaches the door; (4) refuses to drop it on the officer's commands; and (5) refuses to say anything or ask any questions in response to those commands but stands near the officer out of sight behind the door. The officer, reasonably believing he was about to be shot through the door, seeks safety from that position and, in doing so, sees the neighbor holding the gun. Not waiting to be shot, the officer fires his service pistol. Despite these facts, the majority rules that the officer is not entitled to qualified immunity because a jury could find that the officer shot Knibbs while he was only "possess[ing] a firearm in his own home in a non-threatening manner while investigating a nocturnal disturbance on his premises." *Supra* at 41. This makes no sense to me.

### III

Moreover, neither party, nor the majority, has uncovered a case that would inform Deputy Momphard that he should have understood that firing his service pistol in the circumstances of this case violated clearly established law. As the majority recognizes, immunity depends on whether every reasonable officer in Deputy Momphard's situation would have understood that his conduct was unlawful. *See Rivas-Villegas*, 142 S. Ct. at 7–8. And despite that clear principle, the majority can only reason from general principles to argue, *as a lawyer would*, that Deputy Momphard should have known that he could not shoot, even in circumstances where he reasonably believed that he was subject to imminent serious physical harm. Indeed, the majority acknowledges, "We recognize that neither the Supreme Court nor this Circuit has considered a qualified immunity case with a fact pattern precisely identical to the instant one." *Supra* at 36. But it does not even come close to

65

providing cases from which an officer such as Deputy Momphard would conclude that his particular conduct was unlawful. Rather, the majority identifies only two cases, which are clearly distinguishable, *Cooper* and *Hensley*, and argues over several pages how a reasonable officer would be able to deduce that he would be violating the law if he did what Deputy Momphard did — this without taking account of the numerous cases pointing the other way. Fundamentally, the majority fails to demonstrate that reasonable officers would know *from clearly established law* that what Deputy Momphard did was, *beyond debate*, unlawful in the circumstances.

The two cases the majority relies upon for its analysis, *Cooper* and *Hensley*, hardly inform reasonable officers standing in Deputy Momphard's circumstances. Indeed, reasonable officers would more likely have recognized the distinguishing facts in them and concluded that they do not inform the circumstances. In *Cooper*, unlike in this case, the officers *never announced themselves*, even when the victim called out for anyone in the yard to identify himself, and the officers opened fire on the victim without warning when he walked out of the home with a shotgun to see who was outside. 735 F.3d at 155–56. We agreed with the district court that "no reasonable officer could have believed that [Cooper] was aware that two sheriff deputies were outside," but we expressly noted that had the officers identified themselves, "they might have been safe in the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat." *Id*. at 159–60. Here, as noted, Deputy Momphard did identify himself, and there were numerous other undisputed facts that would lead a reasonable officer to believe that Knibbs knew that it was an officer who was outside the door. Similarly, in *Hensley*, the deputies "concede[d]

66

that neither of them ever spoke to" the victim; that they *never announced their presence*; and that they "*never ordered* [*him*] *to stop, to drop the gun* or issued any type of warning." 876 F.3d at 578 (emphasis added). Again, this is markedly different from the facts at hand, where Deputy Momphard announced himself numerous times and also repeatedly ordered Knibbs to drop his gun prior to shooting.

Thus, while the facts in *Cooper* and *Hensley* would not have made clear to a reasonable officer in Deputy Momphard's circumstances that his conduct was unlawful, numerous cases from our court would have more clearly indicated that his use of deadly force was justified. For example, in *Slattery*, we concluded that an officer was entitled to qualified immunity when he shot a suspect *who ignored commands* to show his hands before turning toward the officer with what turned out to be only a beer bottle in a clenched fist. 939 F.2d at 215, 217. Similarly, in *Anderson*, we concluded that an officer who shot a suspect had not used excessive force when he told the victim to raise his hands over his head and instead, without explanation, the man reached down to where the officer believed he had a gun hidden under his clothing, when the victim was in fact unarmed. 247 F.3d at 127–31. Again, in *Elliott*, the officers were held to have acted reasonably in shooting a person who was handcuffed, but had his finger on the trigger of a handgun, and *who refused to drop the gun after being commanded to do so*. 99 F.3d at 641–43. And in *Sigman*, the officers were held to have acted reasonably in firing at a man who carried a chef's knife and *refused to drop the knife* as he approached the officers, despite several warnings. 161 F.3d at 785, 788; *see also City of Tahlequah v. Bond*, 142 S. Ct. 9, 10 (2021) (per curiam) (holding that officers were immune for use of deadly force when a person ignored

67

commands to drop a hammer and instead "raised the hammer higher back behind his head and took a stance as if he was about to throw the hammer or charge at the officers").

In this case, Deputy Momphard knew that Knibbs was actually armed; that he had announced himself loudly and clearly as an officer; and that Knibbs had refused multiple commands to drop the gun, without providing any explanation or response to the officer. In such circumstances, it would not be clear to any reasonable officer, based on precedents from our court or the Supreme Court, that the use of deadly force was unlawful. Instead of recognizing this, the majority makes the same error as did the lower court in *City of Tahlequah*, namely "contravene[ing]" settled principles of law and relying on cases that have "dramatically different" facts in order to improperly find the officer is not entitled to qualified immunity. 142 S. Ct. at 12.

Our officers in uniform deserve clearer guidance than this before they are held liable, especially when they, in good faith, believe that they are performing their jobs lawfully, albeit in a manner that results in tragic consequences.

IV

Over the years, the Supreme Court has repeatedly admonished courts of appeals to recognize police officers' immunity. And only recently, perhaps in some exasperation, it again reminded courts of appeals of this fact. In *City of Tahlequah*, the Court reiterated that "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law" and noted that it has "*repeatedly told courts* not to define clearly established law at too high a level of generality. It is not enough that a rule be suggested

by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." 142 S. Ct. at 11 (emphasis added) (cleaned up). The Court determined that officers presented with a far less serious risk than was presented here were entitled to qualified immunity when the person they shot looked like he was going to throw a hammer at the officers after the officers told him to drop it. The Court also stated in *Rivas-Villegas* what is applicable here — that "existing precedent must have placed the statutory or constitutional question *beyond debate*." 142 S. Ct. at 8–9 (emphasis added) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). Unfortunately, we continue to violate these repeated admonitions.

I would affirm, concluding both that Deputy Momphard did not violate Knibbs's constitutional rights and that, in any event, no existing precedent clearly placed that conclusion beyond doubt.