**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-1393**

_____

AMY RHINEHART CRAVEN, as Administratrix of the Estate of Christopher Kimmons Craven,

Plaintiff - Appellant,

v.

CHRISTOPHER NOVELLI, individually and official capacity as Officer of Mooresville Police Department; ALEXANDER ARNDT, individually and official capacity as Officer of Mooresville Police Department; TOWN OF MOORESVILLE,

Defendants - Appellees.

_____

Appeal from the United States District Court for the Western District of North Carolina, at Statesville.  Kenneth D. Bell, District Judge.  (5:21-cv-00174-KDB-SCR)

_____

Argued:  March 19, 2024                          Decided:  May 3, 2024

_____

Before KING, THACKER, and RUSHING, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** John Alexander Heroy, JAMES, MCELROY & DIEHL P.A., Charlotte, North Carolina, for Appellant.  Jake William Stewart, CRANFILL SUMNER LLP, Charlotte, North Carolina, for Appellees.  **ON BRIEF:** Preston O. Odom, III, Jennifer M. Houti, JAMES, MCELROY & DIEHL P.A. Charlotte, North Carolina, for Appellant.  Steven A. Bader, Raleigh, North Carolina, Patrick H. Flanagan, CRANFILL SUMNER LLP, Charlotte, North Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This appeal arises from a harrowing 911 call made by the stepdaughter of Christopher Kimmons Craven, seeking help in a domestic violence crisis. During the call, she reported that Mr. Craven, while armed with a gun, had attacked her mother, his wife, Amy Craven, and was threatening to take his own life. A team that included Corporal Alexander Arndt and Officer Christopher Novelli (jointly with Corporal Arndt, the "Officers") responded to the call. When law enforcement arrived on the scene, Mr. Craven confronted them outside. Despite the Officers' commands for Mr. Craven to show them his hands and get on the ground, Mr. Craven continued to advance on them. Faced with a threat to their safety, the Officers used deadly force against Mr. Craven. Mr. Craven passed away at the scene.

Acting as the administratrix of Mr. Craven's estate ("Appellant"), Ms. Craven filed this action, alleging that the Officers improperly used excessive force in violation of Mr. Craven's constitutional rights and state tort law, and that the Town of Mooresville ("Mooresville"; and with the Officers, "Appellees") failed to provide the Officers with adequate training and supervision. The district court granted summary judgment to Appellees, concluding that the Officers acted reasonably in light of the circumstances.

On appeal, we affirm the judgment of the district court.

3

I.

A.

The 911 Call

During the summer of 2020, Mr. Craven lived in Mooresville with his wife; her twenty one year old daughter from a previous marriage, Taylor Dunn; and the Cravens' biological son and daughter, who were thirteen and seven.

The COVID-19 pandemic heightened Mr. Craven's pre-existing anxiety and contributed to his struggle with depression. On the evening of August 2, 2020, Mr. Craven "went into [a] mental health crisis," J.A. 209,[1] during which he became increasingly anxious and frustrated and began expressing that he did not want to live. Ms. Craven and Dunn decided to call 911, and Dunn called at approximately 9:30pm.

The recording of the 911 call sheds light on the events that unfolded at the Cravens' home that evening. On the 911 call recording, Dunn first says to the operator, "My stepdad hit my mom in front of me and my siblings and he is threatening to blow his brains out . . . and he is screaming and getting in her face and he won't stop." *Id.* at 225. During her deposition, Ms. Craven recounted that around that time, Mr. Craven exited their bedroom momentarily, only to return and close the door with her still inside. According to Ms. Craven, Mr. Craven brandished a gun and held it to his head, threatening to end his own life. On the recording, Dunn can be heard screaming to the operator that Mr. Craven had her mother locked in the bedroom. Mr. Craven then comes out of the bedroom and can be

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

heard on the recording saying, Dunn "called 911 so I'm going out there to do it right now, thank you." *Id.* at 226. This prompts more "kids crying and screaming in the background," as the children plead with their father not to end his life. *Id.*

When the 911 operator asks Dunn, "Do you see a gun on [Mr. Craven]?" Dunn responds, "I'm assuming he has it. Because he said he did." J.A. 227–28. Dunn then confirms to the 911 operator that both Ms. Craven and Dunn's brother had observed the gun on Mr. Craven. Dunn also reports that Mr. Craven had left the residence, and she was unable to see what he was doing outside. Upon his return inside the house, Mr. Craven asks for his phone, saying that he wanted his phone so he could call his mother to tell her goodbye. Seconds later, Mr. Craven can be heard saying, "When the police show up here, thank [Dunn] because (inaudible) . . . . You won't have a [expletive] daddy no more (inaudible)." *Id.* at 229.

Shortly after Mr. Craven made those comments, he went outside. On the call recording, shots can be heard in the background, followed immediately by Dunn reporting to the operator, amid screaming, that she can hear gunshots.

B.

The Officers' Perspective

When the Mooresville Police Department ("MPD") received a dispatch call at approximately 9:30pm that evening, the Officers knew none of the Craven family's history and only sparse details of Dunn's frantic 911 call, as reported to them by dispatch. In the initial call, Officer Novelli, who was sitting in a grocery store parking lot in his patrol car, and Corporal Arndt, who was at the MPD office, were told that a man had assaulted his

5

wife and was threatening to "blow his brains out." J.A. 75. Both officers immediately began driving with their sirens and flashing lights on to the Craven residence.

It took the Officers a little over three and a half minutes to arrive. While they drove, they learned more about the situation:

- "Male subject is going outside to a trailer or shed," J.A. 233 at 1:05;

- "Units heading toward[] [the residence], there hasn't been a shot discharged yet," *id.* at 2:03;

- "Male subject is still outside at this time," *id.* at 2:11;

- Someone asks, "Does anybody have a gun?" *id.* at 2:15, and dispatch reports, "Our caller is stating that she is assuming he has [a gun] -- still trying to determine," *id.* at 2:34; and,

- "Mother and son both confirming that he does have a gun on him," *id.* at 3:12.

Corporal Arndt, Officer Novelli, and the other MPD officers who were dispatched met down the street from the Cravens' house to ready themselves to approach on foot. While they were gathering, the Officers were told, "Subject is outside -- he may or may not be in the out-building or trailer . . . . They don't have eyes on him, but he is outside," J.A. 233 at 3:38, then "Caller says that he may be coming back into the house," *id.* at 5:01, and finally, "He is back in the house. I can hear him yelling in the background," *id.* at 5:25. Knowing that Mr. Craven's wife (who had already been assaulted) and children were inside, the Officers immediately started approaching the house.

As the Officers approached the driveway leading to the house, but before Mr. Craven was visible, the Officers heard Mr. Craven shout something from the direction of the house. During their deposition testimony, neither Officer could distinctly recall what

Mr. Craven might have yelled. Corporal Arndt recalled hearing something like "just shoot me" or "you are going to have to shoot me." J.A. 76. Officer Novelli thought he may have heard Mr. Craven yell, "What are you going to do" or "You're going to have to [expletive] kill me." *Id.* at 72. In the summary judgment briefing below, Appellant contended that "the audio in the video footage is not clear, but can reasonably be interpreted as [Mr.] Craven saying nothing, or 'Ya'll know you *don't* have to shoot me.'" *Id.* at 243 (emphasis in original).

As soon as the Officers spotted Mr. Craven, Corporal Arndt yelled "Police Department" and "let me see your [expletive] hands, let me see your hands!" J.A. 233 at 6:29–:30. At that point, Mr. Craven can be seen on the video moving along the sidewalk next to the stairs leading up to the front porch of the house. On Mr. Craven's waistband is a black gun holster, but the video is not clear as to whether there is a gun in the holster. In response to Corporal Arndt's command, the video depicts Mr. Craven raising both of his hands, but then swiftly lowering them toward his waist. When Corporal Arndt saw Mr. Craven's hands come back down, he yelled for Mr. Craven to "get on the [expletive] ground!" *Id.* at 6:32.

All parties agree that, at that point in the body camera footage, the Officers' flashlights make Mr. Craven's movements difficult, if not impossible, to discern. The Officers testified that after Mr. Craven lowered his hands, he reached toward his waistband and drew a handgun with his right hand. It was at this moment that the Officers commenced firing their rifles until Mr. Craven collapsed to the ground. Appellant contests that Mr. Craven ever reached for his waistband or pulled out a gun.

7

The Officers moved in toward Mr. Craven, and Corporal Arndt asked, "Where did the handgun go?" J.A. 233 at 6:56. In the video, a light is flashed on a handgun lying near Mr. Craven's right shoulder on the steps of the porch. The body camera footage did not show any gun lying on the steps prior to the shooting incident. Officer Novelli and other MPD officers then went into the house to check on the family, and Corporal Arndt and others provided medical attention to Mr. Craven until paramedics arrived.

Tragically, Mr. Craven died at the scene. An autopsy later revealed that Mr. Craven was shot at least fifteen times, "while other rounds penetrated the home where [Appellant] and her three children were located." *See* Appellant's Opening Br. at 5. Other than hearing the gunshots, no one inside the house or any neighbors heard or saw the Officers' interaction with Mr. Craven.

## C.

### The Litigation

#### 1.

Appellant commenced this action on September 7, 2021, by filing a complaint in the Superior Court of Iredell County, North Carolina. The complaint alleges claims for excessive use of force in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983, negligence/gross negligence, assault and battery, and wrongful death based on the Officers' use of deadly force against Mr. Craven. The complaint also lodges a claim against

8

Mooresville for its alleged failure to train the Officers to respond properly to mental health crises. Appellees removed the action to federal court.

2.

Appellees filed a motion for summary judgment, seeking to dismiss all of Appellant's claims. In support of the motion, Appellees attached under seal a recording of the 911 call, the transcript of the 911 call, and excerpts from the depositions of Dunn and Ms. Craven that discuss one or more of the 911 exhibits and their contents (collectively, "the 911 Call Evidence"). Appellant opposed Appellees' motion for summary judgment and filed a motion *in limine* and motion to strike (the "Evidentiary Motions"), seeking to exclude the 911 Call Evidence on the grounds that the Officers did not hear the call and it was unduly prejudicial. The district court granted Appellees' motion for summary judgment and denied Appellant's Evidentiary Motions.

a.

Starting with Appellant's § 1983 claim for use of excessive force, the district court concluded, "The record in this case cannot support a finding that the Officers' conduct was not objectively reasonable, [even] viewing the evidence in a light most favorable to the [Appellant]." J.A. 537. The district court reasoned that, when the Officers deployed deadly force, they undisputedly knew the following:

> 1) they were confronting a person who had assaulted his wife;
> 2) Mr. Craven was, at a minimum, unstable and agitated because he had threatened "to blow his brains out" and had been yelling very shortly before [the Officers' arrival]; 3) Mr. Craven was armed with a handgun; and 4) after being told to raise his hands, he lowered his hands toward[] the holster in his waistband.

9

*Id.* Based on these facts, the district court determined it was reasonable for the Officers to believe that, when Mr. Craven reached down toward his waist, he presented an immediate risk of serious physical harm to the Officers.

But even if Appellant could make out a § 1983 violation, the district court held that qualified immunity would apply because no established law made it clear that the Officers were violating Mr. Craven's constitutional rights when they used deadly force under the circumstances. Based on the above facts, the district court reasoned that clearly established law tended to support the Officers' conduct.

b.

Next, the district court considered Appellant's claim against Mooresville for failure to properly train its officers -- commonly referred to as a "*Monell* claim." *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (limiting government liability to those circumstances where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts [an] injury"). Appellant attempted to make out a *Monell* claim for Mooresville's alleged failure to train the Officers "in the proper use and application of deadly force, de-escalation, and how to interact with and respond to citizens experiencing a mental health crises and threatening suicide." J.A. 16. Appellant alleged that this lack

10

of training manifested in the Officers' "deliberate indifference to the Constitutional rights, and the safety, of citizens like [Mr.] Craven undergoing a mental health crisis." *Id.* at 262.

The district court noted that its finding that the Officers did not violate Mr. Craven's constitutional rights was fatal to Appellant's *Monell* claim. Even so, the court also held that Appellant could not point to any "deliberate or conscious" failure by Mooresville to support its claim. J.A. 550–51. The court held that Mooresville established through evidence in the record that it does in fact train MPD officers on how to handle individuals suffering from mental health crises. Further, the court held that "[a]t its core, the strict *Monell* test asks for some level of notice." *Id.* at 551 (citing *Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020)). The district court concluded that Appellant could not establish that Mooresville had the requisite notice of the alleged issue with responding to mental health crises by pointing to a single incident. Indeed, the district court observed, "Proof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of [the] municipal custom" necessary to establish a *Monell* claim. *Id.* (citing *Semple v. City of Moundsville*, 195 F. 3d 708, 713–14 (4th Cir. 1999)).

c.

The district court then addressed Appellant's state law tort claims for assault and battery. The district court noted that the "merits of these claims primarily follow and depend on [Appellant] establishing -- as was required under her federal claim -- that the Officers acted wrongfully and violated Mr. Craven's rights, resulting in his death." J.A. 553. Therefore, the district court granted summary judgment for Appellees on the assault

11

and battery claims for the same reasons it relied on in dismissing Appellant's federal claims.

d.

Finally, in analyzing Appellant's wrongful death, negligence, and gross negligence claims, the district court considered whether the Officers possessed public official immunity pursuant to North Carolina law so as to shield them from these claims. Pursuant to North Carolina law, a public official cannot be held liable for negligence, except where the alleged negligent activity is either "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Wilcox v. City of Asheville*, 730 S.E.2d 226, 230 (N.C. App. 2012).

Appellant argued that the Officers could not qualify for public official immunity because they acted with malice. In support of its argument, Appellant relied on text messages exchanged between the Officers which were sent over a period of seven to 16 months after the incident. The text messages reflect insensitive and inappropriate remarks. For instance, after receiving the autopsy report, Officer Novelli texted Corporal Arndt, "THERES [sic] SO MANY GUNSHOTS . . . We shot him in the neck lol." *See* J.A. 427 (emphasis in original). Subsequently, Corporal Arndt texted Officer Novelli, "Dang we going to prison," to which Officer Novelli responded, "I'm already in canada [sic]." *Id.* at 429.

While the district court agreed that the Officers "inappropriately made insensitive remarks," it nonetheless concluded that public official immunity applied because the texts did not support that the Officers acted with malice at the time of the incident. J.A. 555.

12

Moreover, the district court observed that the Officers' lack of malice was further supported by their text exchange in the days immediately following the shooting. The district court noted that those messages were "much more circumspect, with the Officers' texts saying that 'it sucks that it happened' and it was 'unfortunate.'" *Id.* at 555–56 (quoting *id.* at 434, 440).

### e.

As to Appellant's Evidentiary Motions, Appellant argued that the 911 Call Evidence was irrelevant, and its probative value was substantially outweighed by its risk of prejudice, requiring exclusion pursuant to Federal Rules of Evidence 401 and 403. The district court did not agree. Instead, the district court held that the 911 Call Evidence was relevant to the nature of the scene at the time the Officers arrived, including Mr. Craven's possession of a gun, and Mr. Craven's intent to confront police once they arrived at the house. Regarding the question of unfair prejudice, the district court observed that although a limiting instruction may have been necessary at trial to confine the jury's consideration of the 911 Call Evidence, there was no basis to label the 911 Call Evidence as unfairly prejudicial at the summary judgment stage. For these reasons, the district court denied Appellant's Evidentiary Motions.

This timely appeal followed.

### II.

We review the district court's grant of summary judgment de novo. *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). We "determine de novo whether the facts . . . establish the deprivation of an actual constitutional right," *Leverette v. Bell*, 247

13

F.3d 160, 166 (4th Cir. 2001), and "[w]e review de novo an award of summary judgment on the basis of qualified immunity," *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). "Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'" *Henry*, 652 F.3d at 531 (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).

### III.

Appellant challenges the district court's award of summary judgment to Appellees. Appellant argues that the district court erred when it found the Officers did not violate Mr. Craven's constitutional rights because Appellant contends no reasonable officer would have believed that Mr. Craven posed a threat of serious harm. Further, Appellant contends that clearly established law supports that the Officers acted unreasonably and in violation of the Fourth Amendment when they used deadly force against Mr. Craven. Finally, Appellant argues that its remaining claims were improperly dismissed based on these erroneous rulings.

We affirm the district court's judgment because the Officers' use of deadly force was reasonable in light of the circumstances and did not violate any clearly established law. Because Appellant's § 1983 claim underlies its additional claims, we likewise affirm the district court's dismissal of those claims.

14

A.

Appellant's Evidentiary Motions

Appellant challenges the district court's denial of its Evidentiary Motions, which sought to exclude from evidence certain exhibits and testimony related to the 911 call offered by Appellees.

Appellant claims the 911 Call Evidence is irrelevant and unduly prejudicial. Appellant argues that the district court erred by allowing into the record the 911 Call Evidence because "its prejudicial value vastly outweighs any probative value it may hold, given that this information could not have played a role in Officer Novelli's and Corporal Arndt's decision to use deadly force." Appellant's Opening Br. at 47. In response, Appellees argue that the 911 Call Evidence confirms that Mr. Craven intended to confront the Officers when they arrived and is relevant to how the Officers assessed the situation they walked into that night.

It is well settled that "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. Evidence is relevant only if it has the "tendency to make a fact more or less probable than it would be without the evidence," and then only if that "fact is of consequence in determining the action." Fed. R. Evid. 401. Even where arguably relevant, evidence may be excluded "if its probative value is substantially outweighed" by its prejudicial value. Fed. R. Evid. 403. Evidence is unfairly prejudicial where there is "the possibility that the evidence will excite the jury to make a decision on the basis of a factor unrelated to the issues properly before it." *United States v. Simpson*, 910 F.2d 154, 158 (4th Cir. 1990) (internal quotation marks omitted). We apply "a highly deferential standard of review to

15

such an issue, and a trial court's decision to admit evidence over a Rule 403 objection will not be overturned except under the most extraordinary circumstances, where that discretion has been plainly abused." *United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014) (internal quotation marks omitted).

Here, the district court was correct that the information available to the Officers at the time deadly force was used is relevant to the court's analysis of whether such force was reasonable. The details from the 911 call which dispatch shared with the Officers are critical to that analysis. As the district court noted, the 911 call corroborates the Officers' testimony that the situation was tense and violent. Further, the district court reasoned that the probative value of the 911 Call Evidence was not substantially outweighed by its prejudicial nature because it supports that dispatch viewed this incident as a domestic violence incident and not only a mental health call. We agree.

Because "the reasonableness of an officer's use of deadly force is based on the information available to the [officers] immediately prior to and at the very moment they fired the fatal shots," *Hensley*, 876 F.3d at 582 (internal quotation marks omitted), the district court did not abuse its discretion by relying on the 911 Call Evidence.

B.

Section 1983 Claim

Section 1983 "creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). If a constitutional violation is found to have occurred, law enforcement officers may nonetheless invoke the doctrine of

16

qualified immunity, which shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity is designed to protect[] law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *Aleman v. City of Charlotte*, 80 F.4th 264, 284 (4th Cir. 2023) (alterations in original) (internal quotation marks omitted).

The qualified immunity analysis consists of two prongs: (1) whether a statutory or constitutional violation occurred, and (2) whether the right was clearly established at the time of the violation. *Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "Appellant's case survives summary judgment, . . . only if we answer both questions in the affirmative." *Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892, 898 (4th Cir. 2016).

1.

We first assess whether the Officers violated Mr. Craven's Fourth Amendment rights by employing excessive force when they fatally shot him.

The Fourth Amendment permits the use of deadly force when a police officer "has probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others." *Cooper*, 735 F.3d at 159 (alterations in original) (internal quotation marks omitted). The central question is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Here, "courts must construe all historical facts in

17

favor of the non-moving party to determine whether the dispute affects the outcome of the claim under the governing law." *Armstrong v. Hutcheson*, 80 F.4th 508, 514 (4th Cir. 2023). "Said differently, the court must decide, under the nonmovant's version of the facts, the purely legal issue of whether a constitutional violation has occurred." *Id.*

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). But the Supreme Court has counseled that the test "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Graham*, 490 U.S. at 396). The Court has enumerated three factors to guide this balancing. First, we look to "the severity of the crime at issue"; second, we examine the extent to which "the suspect poses an immediate threat to the safety of the officers or others"; and third, we consider "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* (alteration supplied) (quoting *Graham*, 490 U.S. at 396). Considering the totality of the circumstances in this case, we conclude that a reasonable officer faced with similar circumstances would determine that Mr. Craven "pose[d] an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396.

a.

When the Officers arrived on the scene, they had reason to believe that Mr. Craven was both armed and dangerous. The Officers had been informed that Mr. Craven had assaulted at least one family member and had threatened to shoot himself. By the time the

18

Officers arrived on the scene, the dispatcher had confirmed that Mr. Craven was armed with a gun.

With all of this in mind, Corporal Arndt confronted Mr. Craven, who was wearing a black gun holster on his waist. Corporal Arndt immediately identified the Officers as law enforcement and yelled to Mr. Craven, "Let me see your [expletive] hands." J.A. 233 at 6:28–29. The video footage supports that Mr. Craven heard this order because he responded by raising his hands above his head. But Mr. Craven did not keep his hands up. Instead, he almost immediately put them back down and continued to advance toward the Officers. At that point, which is mere seconds after the first order but nevertheless after Mr. Craven brought his hands back down, Corporal Arndt yelled for Mr. Craven to "get on the [expletive] ground."[2] *Id.* at 6:32–33. Again, Mr. Craven failed to adhere to the Officers' commands. Instead, Mr. Craven moved quickly toward the Officers. When Mr. Craven continued to approach the Officers, they opened fire on him.

---

[2] Appellant argues that Mr. Craven "was likely confused by the commands issued by law enforcement." Appellant Opening Br. at 27. Appellant contends that the Officers ordered Mr. Craven "to raise his hands and then to lower himself to the ground – something he could not do without lowering his hands." *Id.* at 28. But the video reveals a different sequence of events. First, the Officers ordered Mr. Craven to put his hands up. After Mr. Craven failed to comply, lowering his hands back down, then the Officers ordered him to get on the ground. In this instance, no reasonable jury would find that these commands conflicted or caused Mr. Craven to lower his hands. *Scott v. Harris*, 550 U.S. 377, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

b.

In similar circumstances, we have found the use of deadly force reasonable where an armed suspect confronts law enforcement officers who have identified themselves, and despite their clear commands, the suspect makes some furtive movement. For instance, in *Slattery v. Rizzo*, we found an officer's use of deadly force reasonable where, after two commands for the suspect to put his hands up, the suspect reached down and his hand "appeared to be partially closed around an object." 939 F.2d 213, 215 (4th Cir. 1991). The officer used deadly force, believing -- mistakenly -- that the suspect was reaching for a firearm. *Id.* It was later determined that the object in question was a beer bottle. *Id.*

Similarly, in *Anderson v. Russell*, we determined the use of deadly force was reasonable where the officers ordered a man suspected of carrying a gun inside a shopping mall to "raise his hands and get down on his knees." 247 F.3d 125, 128 (4th Cir. 2001). While the suspect initially complied with the order by raising his hands, "he later lowered them, without explanation to the officers, in an attempt to reach into his back left pocket to turn off his Walkman radio." *Id.* at 128. We concluded that the officer's belief that the suspect was reaching for a weapon was reasonable. *Id.* at 131 ("This Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action.").

As we emphasized recently, "once the officer issued a verbal command, the character of the situation transformed." *See Knibbs v. Momphard*, 30 F.4th 200, 220 (4th Cir. 2022) (quoting *Hensley v. Price*, 876 F.3d 573, 585 (4th Cir. 2017)). If a suspect continues to move and fails to show the officer his or her hands after being commanded to

20

do so, "the suspect's *continued movement* will likely raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions." *Id.* (quoting *Hensley*, 876 F.3d at 585) (emphasis supplied in *Knibbs*).

Likewise, in this case, the Officers reasonably believed that Mr. Craven posed an immediate risk of harm when he persisted in advancing toward them and, despite their commands, dropped his hands toward his waist where a gun holster was located.

c.

Appellant argues that the district court failed to view the facts in the light most favorable to Appellant when it assessed the video footage and credited the Officers' testimony. Appellant specifically contends that Mr. Craven, who was suffering from a mental health crisis, was not a threat to anyone, especially since the assault on his wife had ended by the time law enforcement arrived. Next, Appellant argues that, considering Fourth Circuit precedent, Mr. Craven's lawful possession of a gun alone did not make him a threat. Finally, Appellant avers that the record is disputed as to what Mr. Craven called out to police when they arrived and whether he actually pulled out a gun and aimed it at the Officers.

i.

Despite Appellant's contentions that the scene "had calmed" by the time the Officers arrived, Appellant's Opening Br. at 13, the record supports that the environment remained volatile and dangerous when Mr. Craven confronted the Officers.

Nothing about this scene would indicate to a reasonable officer that the present danger had passed. Only a minute prior to arriving at the Craven residence, dispatch

21

informed the Officers that Mr. Craven could be heard yelling in the background of the 911 call. When the Officers arrived on the scene, the alleged crime -- a domestic assault by an armed perpetrator -- involved at least a heightened level of violence and created an "atmosphere [that] was volatile and threatening," weighing in the Officers' favor. *See Sigman v. Town of Chapel Hill*, 161 F.3d 782, 787 (4th Cir. 1998) (weighing in the officer's favor that at the time he approached the scene, the officer "had ample knowledge of [the suspect's] dangerousness").

And even though, viewed in a light most favorable to Appellant, Mr. Craven was suffering from a mental health crisis, that fact does not rule out the threat to the Officers. As this court has stated, "[m]ental illness, of course, describes a broad spectrum of conditions and does not dictate the same police response in all situations." *Estate of Armstrong*, 810 F.3d at 900. In this case, the information conveyed to the Officers by dispatch indicated that more than just a mental health crisis was transpiring. To the contrary, the Officers were aware that Mr. Craven was armed with a gun, had assaulted his wife, and was threatening to take his life in front of his children, distinguishing this case from those in which mental health played a pivotal role in our analysis. *See id.* (noting that Armstrong's mental illness "was thus one of the facts and circumstances that a reasonable officer on the scene would ascertain," especially where Armstrong was the subject of an involuntary commitment order who had fled from a nearby hospital and was not the suspect of any crime or potentially armed (internal quotation marks omitted)); *Clem v. Corbeau*, 284 F.3d 543, 553 (4th Cir. 2002) (finding a constitutional violation where the officer shot an unarmed, mentally ill man blinded by pepper spray).

22

ii.

In support of the argument that Mr. Craven was not a threat by simply possessing a firearm, Appellant relies on cases where suspects were lawfully armed on their own property and not threatening police. But these cases are at odds with the facts at play here.

Appellant cites *Cooper v. Sheehan* for the proposition that merely holding a firearm does not automatically allow officers to deploy deadly force. 735 F.3d 153. But *Cooper* is distinguishable. In that case, the officers did not identify themselves to Cooper when they tapped on the window of his house, and Cooper came out onto his porch with a shotgun to "investigate the noise." *Id.* at 155. We noted the following facts as important for determining that, even though he was armed, a jury could find that Cooper did not reasonably pose a threat of serious physical harm or death to the police:

> When the Officers fired on Cooper, he stood at the threshold of his home, holding the shotgun in one hand, with its muzzle pointed at the ground. He made no sudden moves. He made no threats. He ignored no commands. The Officers had no other information suggesting that Cooper might harm them. Thus, the facts fail to support the proposition that a reasonable officer would have had probable cause to feel threatened by Cooper's actions.

*Id.* at 159.

Like in *Cooper*, we concluded in *Hensley v. Price* that a jury could find that officers used excessive force when they shot and killed Hensley without identifying themselves as law enforcement or ordering Hensley to drop the weapon. 876 F.3d 573. In that case, we determined that genuine disputes barred summary judgment when, at the time the officers

23

killed Hensley on his property, "he was pointing the gun at the ground and was threatening neither the Deputies nor his daughters." *Id.* at 582. In sum, we determined:

> if believed by a jury, Hensley made no threatening statements or actions toward anyone in the moments immediately preceding the shooting. Instead, Hensley stepped off the porch and into the yard, keeping the handgun pointed toward the ground at all times. Nevertheless, almost immediately after he stepped into the yard, the Deputies opened fire on Hensley and killed him without warning.

*Id.* at 583; *see also Betton v. Belue*, 942 F.3d 184, 192 (4th Cir. 2019) (concluding that disputes barred summary judgment where officers broke down a suspect's door without identifying themselves as police and shot a man who held a gun pointed down to the ground).

Appellant also relies on *Aleman v. City of Charlotte*, 80 F.4th 264. In *Aleman*, officers responded to a call from Ruben Galindo Chavez (who used the surname "Galindo"), who was "[seeking] to turn himself in" and informed dispatch he had a gun. *Id.* at 270. When Galindo called the police for help, he indicated that he was not "thinking of harming the officers or anyone in [his] house." *Id.* at 271 (internal quotation marks omitted). The facts in *Aleman* are a far cry from this case, where the Officers were responding to the scene after Mr. Craven's stepdaughter called 911, frantically reporting that Mr. Craven had hit her mother, had a gun, and was threatening to take his own life.

Moreover, in *Aleman*, we also highlighted the impact of the language barrier between the Spanish speaking Galindo and the police. For instance, we stated, "In the midst of the Spanish and then English commands, Galindo demonstrated uncertainty as to whether he should throw his pistol or continue holding it in his raised left hand." *Id.* at

24

290.  Even so, Galindo "demonstrated that he was trying to understand and comply with the officers' instructions." *Id.*  We pointed out that Galindo "did not make any movement suggesting that he was about to fire the pistol." *Id.*  Rather, Galindo stood "still with both his arms frozen in place and both his hands in the air, in a universally recognized position of surrender." *Id.* at 274.  Despite his compliance, "[i]t was at that point that [the officers] fired at Galindo twice." *Id.*

*Cooper*, *Hensley*, and *Aleman* are readily distinguishable from the facts at issue here.  Mr. Craven knew that the police were coming.  And when they arrived, the Officers clearly identified themselves when they confronted Mr. Craven outside of his house.  The Officers made clear and non-conflicting commands for Mr. Craven to show them his hands.  Mr. Craven did so for only a second, but he did not remain still with his hands up -- the "universally recognized position of surrender." *Id.* at 274.  Instead, Mr. Craven, who was wearing a gun holster and who the Officers had been advised was armed, dropped his arms back to his waist and continued to approach the Officers.  Corporal Arndt gave Mr. Craven an additional opportunity to surrender when he commanded Mr. Craven to get on the ground.  When, again, Mr. Craven refused to comply and continued to advance on the Officers, he was tragically -- but not unreasonably -- fired on by the Officers.  While the video footage does not clearly show a gun in Mr. Craven's holster or waistband when he was faced with the Officers' commands, the black gun holster can be identified on Mr. Craven's waist in the video before the Officers opened fire.  And once the Officers approached Mr. Craven after shots were fired, the presence of the handgun is confirmed.

25

In situations like these, the law makes "allowance[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. And, in this case, the judgment of the Officers was reasonable.

iii.

Finally, Appellant argues that the district court improperly drew inferences in Appellees' favor when it credited the Officers' testimony that Mr. Craven made a furtive movement, reached for his waistband, and "pulled out a handgun with his right hand" after the Officers ordered him to put up his hands. *See* J.A. 532. But whether Mr. Craven reached directly for his waist or actually pulled out the gun is immaterial to the court's analysis where Mr. Craven dropped his arms toward his waist after commands to show his hands.

A police officer is not required to "wait until a gun is pointed at him before he is entitled to use deadly force when other factors (like furtive movement) indicate an imminent threat to life." *See Knibbs*, 30 F.4th at 222. While the body camera footage is not entirely clear as to whether Mr. Craven drew his gun on the Officers, it clearly supports that when faced with clear commands to submit to the Officers, Mr. Craven failed to do so and instead dropped his hands toward his waist where a holster was visible. That alone is enough to support that the Officers acted reasonably when they deployed deadly force. *See id.* at 220–22 (discussing why a suspect's continued movement, after clear commands to refrain from doing so, amounts to reasonable suspicion of danger where the suspect is believed to be armed).

26

The same is true for what Mr. Craven may have yelled out to the Officers upon their arrival. Even without crediting the Officers' testimony that they recall hearing something like "you're going to have to shoot me," (J.A. 72), Mr. Craven's furtive movements, in light of the Officers' commands to surrender himself, created probable cause that Mr. Craven posed a serious risk of harm. Whether Mr. Craven shouted something different as Appellant contends, such as "you *don't* have to shoot me" (*id.* at 243), as Appellant argued before the district court, or "y'all know you don't have to do this," which Appellant's counsel suggested at oral argument, such statements would not dispel the risk of harm to the Officers. Oral Argument at 2:45–3:01, *Craven v. Novelli*, No. 23-1393 (4th Cir. Mar. 19, 2024), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments. In fact, this theory would still indicate that Mr. Craven knew he was confronting police and yet failed to comply with the Officers' commands and continued to advance on them.

Therefore, we agree with the district court that it was reasonable for the Officers to believe that Mr. Craven posed an immediate risk of serious harm and, thus, there was no constitutional violation here.

### 2.

Even if the Officers lacked an objectively reasonable belief that Mr. Craven posed a serious risk of harm, we agree with the district court's alternative conclusion that qualified immunity would nevertheless apply because no established law at the time clearly

27

conveyed to the Officers that their actions would have amounted to a constitutional violation.

Indeed, based on our analysis detailed above, the Officers' actions were consistent with, and not in violation of, clearly established law where Mr. Craven, whom the Officers believed to be armed, failed to adhere to their commands to surrender. The fact that Mr. Craven understood the Officers' clear commands and yet moved his arms down toward his waistband where a gun was believed to be concealed, aligns this case with *Slattery*, 939 F.2d 213, and *Anderson*, 247 F.3d 125, where no constitutional violation was found. Thus, at the time of this incident, no clearly established law indicated that the Officers could not lawfully use deadly force under the circumstances. Therefore, the district court's grant of summary judgment to the Officers was proper.

### C.

### Appellant's Remaining Claims

Appellant argues that the district court improperly granted summary judgment on the state law claims because the district court's holding that the Officers acted reasonably was erroneous. We disagree.

### 1.

Because, as Appellant admits, the remaining claims rise and fall with the Officers' liability pursuant to 42 U.S.C. § 1983, we need not comprehensively address the district court's dismissal of those claims. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (requiring that a successful *Monell* claim for failure to properly train officers include "a direct causal link between a municipal policy or custom and the alleged constitutional

28

deprivation"); *Glenn-Robinson v. Acker*, 538 S.E.2d 601, 615 (N.C. App. 2000) ("[A]n assault [and battery] by a law enforcement officer upon a citizen can provide the basis for a civil action for damages against the officer only if a plaintiff can show that the officer used force against plaintiff which was *excessive* under the given circumstances." (emphasis supplied) (internal quotation marks omitted)).  Therefore, we affirm the district court's dismissal of Appellant's claim against Mooresville, as well as the state law claims for assault and battery, inasmuch as they fail where no constitutional violation occurred.

2.

Appellant's argument that the district court erroneously applied public official immunity against its negligence, gross negligence, and wrongful death claims likewise necessarily fails.  In North Carolina, a public official only loses this immunity when he or she acts corruptly, maliciously, or outside of the scope of his or her duties. *Showalter v. N.C. Dep't of Crime Control & Pub. Safety*, 643 S.E.2d 649, 652 (N.C. App. 2007). Because the district court properly determined that the Officers acted reasonably and in accordance with clearly established law when they were faced with an armed and potentially dangerous Mr. Craven, we agree that the Officers did not act maliciously.  Thus, the district court appropriately granted immunity against the state law claims.

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

29